UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
ROBERT KOEHLER,

                Plaintiff,

              -against-

METROPOLITAN TRANSPORTATION
AUTHORITY,

                Defendant.
-----------------------------------------------------------X

**OPINION & ORDER**
16-CV-00003 (AYS)

**SHIELDS, Magistrate Judge:**

## INTRODUCTION

On January 3, 2016, plaintiff Robert Koehler ("Plaintiff" or "Koehler") commenced this action against defendant Metropolitan Transportation Authority ("Defendant" or the "MTA") pursuant to the Federal Employers 'Liability Act ("FELA"), 45 U.S.C. § 5l, et seq., seeking, inter alia, damages for personal injuries he allegedly sustained as a result of Defendant's negligence. On October 16, 2016, Plaintiff filed an amended complaint, (appearing as Docket Entry ("DE") [17-2]), which, by electronic order entered March 8, 2017, the Honorable Arthur D. Spatt, former United States District Court Judge to whom this case was initially assigned, accepted for filing, on consent. Pending before the Court are Defendant's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure dismissing Plaintiff's claims in their entirety with prejudice; and Plaintiff's unopposed cross motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure striking Defendant's affirmative defenses asserting that Plaintiff's alleged injuries and/or damages were, in whole or in part, the result of Plaintiff's (i) own contributory negligence (third affirmative defense); and (ii) culpable conduct, want of care, and/or willful violation of Defendant's safety regulations and/or policies (fourth affirmative

1

defense). For the reasons set forth below, Defendant's motion is granted in part and denied in part and Plaintiff's cross motion is granted.

FACTUAL BACKGROUND

I.    <u>Basis of Facts Recited Herein</u>

In support of their cross motions, the parties each filed a statement of facts in accordance with Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Rule 56.1"). To the extent that the statements are properly supported by citation to evidence which would be admissible pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the factual allegations are taken therefrom; otherwise the Court has disregarded any unsupported assertions. <u>Giannullo v. City of New York</u>, 332 F.3d 139, 139 (2d Cir. 2003)[1]. Moreover, only those facts that are material to the disposition of the motion, *i.e.*, that "might affect the outcome of the suit under the governing law," <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986), are set forth herein. <u>See</u> <u>Zann Kwan v. Andalex Grp. LLC</u>, 737 F.3d 834, 843 (2d Cir. 2013) ("The substantive law governing the case will identify those facts that are material, and only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

Both parties also filed their own counter-statement of facts pursuant to Rule 56.1, setting forth areas of agreement, as well as those as to which there is dispute.

II.    <u>Factual Allegations</u>

---

[1] Unless otherwise noted, case quotations omit all internal quotation marks, citations, footnotes, and alterations.

Plaintiff joined the Long Island Railroad Police Department ("LIRR PD") in December 1980. (Defendant's Statement of Material Facts pursuant to Local Rule 56.1, Plaintiff's Responses Thereto and Plaintiff's Counter-Statement of Facts, appearing as DE [45], ¶ 3; Defendant's Response to Plaintiff's Counter-Statement of Facts, appearing as DE [48], ¶ 1.) [2] Effective January 1, 1998, the LIRR PD was merged with the Metro-North Commuter Railroad Police Department to become the MTA Police Department ('MTA PD"). (DE [45], ¶ 3)

Plaintiff received training, including training on making arrests, from the NYPD when he joined the LIRR PD, and he made over a thousand arrests, including hundreds of individuals who resisted arrest, over the course of his career. (DE [45] ¶¶ 5-6; DE [48] ¶ 2.) Plaintiff testified, inter alia, (i) that he goes to the range once a year for additional training; (ii) that he always followed MTA PD procedures when making arrests; and (iii) that he made hundreds of arrests during his career where the suspect fought back, but he does not believe that he had any "real training" on the job about what to do in such instances beyond the basics that he learned at the police academy. (DE [48] ¶ 2.)

Plaintiff understood that his job involved dealing with potentially dangerous individuals and that, as an MTA PD police officer, his role involved assisting officers of other agencies, including the NYPD and State Police, if they needed help in arresting individuals. (DE [48] ¶ 3.) Plaintiff also understood that his job at Penn Station was to help keep the area safe, including arresting criminals and breaking up fights. (Id., ¶ 5.) According to Plaintiff, the MTA PD has a manual, called a patrol guide, which provides officers with procedure and department policy, including how an officer is supposed to make an arrest or assist in making an arrest. (Id., ¶ 4.)

A.    The Metal Barriers

---

[2] Where the facts are undisputed, the Court does not cite to the documents underlying the facts set forth in the parties' respective 56.1 statements and counter-statements.

The MTA PD stored an electric vehicle known as a "GEM" cart in a recessed corner on the concourse of Penn Station, near the Kmart exit. (DE [48] ¶¶ 30, 41, 47, 53.) The natural layout of the recessed area gives the GEM cart protection from the flow of passengers walking through the corridor. (DE [48], ¶ 47.) The cart is backed into its "parking space" so that it does not block the corridor and is ready to pull out when needed. (Id., ¶ 32.)

Although Plaintiff saw the GEM cart parked on the concourse of Penn Station, he had no idea for what purpose it was used[3]. (DE [48] ¶ 10.) However, it is undisputed that the police use the carts when there is a reduced pedestrian flow, typically at nighttime, so they can make a more effective patrol of the station. (Id., ¶ 47.) In addition, Henry Lennon ("Lennon"), who was an MTA PD Captain from October 23, 2013 to June 2015, (DE [45] ¶ 7; DE [48] ¶ 29,) testified that the carts are generally used in non-emergency situations, but they also "play a vital role in emergency situations" because they could be used to transport injured people; "to close off hallways[;] . . . [and] to evacuate the terminal safely." (Transcript of Lennon's Deposition Testimony ("Lennon Tr."), appearing as DE [41-4], at 39:25-41:3.)

Lennon further testified that although there might have been a "non-publicly accessible" space on the LIRR level in Penn Station in which to store the GEM carts, they "need to be accessible in a timely manner so [the police] have them right away." (Lennon Tr., DE [41-4] at 38:9-19.) Raffael Patacca, an MTA PD police officer, also testified that the GEM carts cannot be parked in a storeroom or garage when not in use. (Transcript of Deposition Testimony of Raffael Patacca ("Patacca Tr."), appearing as DE [41-6], at 41:12-15.)

---

[3] Plaintiff's testimony that "[w]hat we heard was the midnight guys were drag racing," (Transcript of Pl's Deposition Testimony, appearing as DE [41-3], at 63:4-5), would not be admissible in evidence. Moreover, despite Plaintiff's assertion that he had no idea of the purpose for which the GEM carts were used, he further testified, somewhat inconsistently, that the GEM carts should have been stored "in the back" because "[t]here was no emergency to use them." (Id. at 65:14-16.)

4

The GEM cart was safeguarded by the use of metal barriers[4] to prevent people from sitting in the cart and from using the outlet on the wall to charge their cell phones. (DE [48], ¶¶ 31, 41, 47-48.) Both Lennon and Patacca acknowledged seeing people do both of those things, (id., ¶¶ 31, 41,) and, as far as Lennon knew, the barriers were effective. (Id., ¶ 31.) However, Sergeant George Thomson ("Thomson") testified that he saw pedestrians get into the GEM cart notwithstanding the presence of the barriers, (Transcript of Deposition Testimony of George Thomson ("Thomson Tr."), appearing as DE [41-5], at 33:12-34:14,) and Patacca testified that he saw people enter the two- to three-foot gap between the barrier and the wall to use the outlet on the wall. (Patacca Tr., DE [41-6] at 25:19-26:8.) Thomson described the metal barriers as about three (3) feet high, situated to form a right angle or "a half square" around the GEM cart, with one barrier running perpendicular from the Kmart storefront and the other running parallel to the concourse. (Thomson Tr., DE [41-5] at 26:19-24, 31:4-32:17.)

Lennon testified that since the security barriers are also used to close off an area for evacuation purposes or emergencies, they were stored in the recessed area near the Kmart store where the GEM cart was stored because they needed to be in a "somewhat centralized" area so they can be utilized "in a hurried or quick situation." (Lennon Tr., DE [41-4] at 28:3-23.)

Patacca testified that although the barriers "all have the option to get hooked" together, it was not necessary to do so since they stand on their own and there was no reason to hook them together at the GEM cart location. (Patacca Tr., DE [41-6] at 24:16-24.) Although Lennon testified that interlocking the barriers when they were placed around the GEM cart "would be the right way to do it," (Lennon Tr., DE [41-4] at 30:21-31:6, 43:10-21,) he also testified that if the barriers surrounding the GEM cart were interlocked, taken them apart would cause a delay in

---

[4] The metal barriers are also referred to as stanchions or gates by the parties and witnesses.

responding to an emergency, which would undermine the reason for why the cart was stored in a publicly accessible area, *i.e.*, to provide quick access to it. (Id. at 44:16-45:6.) Furthermore, there is no policy or procedure by which officers are required to interlock the barriers when using them to secure an area. (DE [45] ¶ 18.)

Except for Plaintiff, none of the MTA PD employees who were deposed in this case ever saw anyone attempt to use one of the metal barriers as a weapon prior to this incident. (Lennon Tr., DE [41-4] at 45:7-11, 50:13-25; Thomson Tr., DE [41-5] at 80:16-21; Patacca Tr., DE [41-6] at 27:18-28:3; Transcript of Deposition Testimony of Gerald Willis ("Willis Tr."), appearing as DE [41-7], at 86:16-20.) Neither did the two New York State Troopers (the "Troopers") who were involved in the incident. (Declaration of Jeromy M. Furman ("Furman Decl."), appearing as DE [41-8], ¶ 7; Declaration of Robert M. Dabreau, Jr. ("Dabreau Decl."), DE [41-9], ¶ 8.)

Plaintiff testified that prior to the incident, he does not remember ever seeing anyone use an unsecured metal barrier as a weapon at Penn Station, (Pl. Tr., DE [41-3] at 148:2-12,) but more than five (5) years earlier, outside MTA headquarters, he saw people who were participating in a demonstration grab crowd control barriers and throw them into police officers and horses. (Id. at 138:17-139:12.) When asked if he recalled any other incidents where someone threw a barrier, Plaintiff responded, "Shea, maybe, Citifield it is now. People – you line the barricades up for crowd control and you got a lot of drunks. People try to pull them, lift them to get by the barriers. Just, you know, they just chuck them." (Id. at 139:13-21.)

B.    The Incident

On November 16, 2014, Plaintiff was working an overtime shift at MTA PD's District 4, which covers Penn Station. (DE [45] ¶ 20; DE [48] ¶¶ 8, 11.) Plaintiff worked at Penn Station approximately ten (10) times in 2014, but his regular job was in the Garden City District. (DE

6

[48] ¶ 8.) Thomson was Plaintiff's tour supervisor on the shift he was working at the time of the incident. (Id., ¶¶ 11, 46.)

At approximately 12:20 p.m. on November 16, 2014, Plaintiff was walking down the concourse in Penn Station and heard somebody screaming "robbery." (DE [45] ¶ 23; DE [48] ¶ 12.) Plaintiff observed that "a state trooper had a guy in a bear hug," so he ran over to help him. (DE [45] ¶ 23; DE [48] ¶ 12.) Plaintiff further testified:

> "[t]he trooper had him in a bear hug, okay? He had been holding on to the gate, he let go of the gate. He didn't move, he just let go of the gate. When I came around I went to grab him, the trooper let him go. I tried to throw him over my hip, but he apparently at some point had grabbed back onto the gate."

(DE [45] ¶ 32.) As New York State police officers, the Troopers are authorized to make arrests in Penn Station. (Id., ¶ 48.) Plaintiff was the first MTA PD officer on the scene because he was situated the closest when it happened. (Id.)

Additionally, Plaintiff testified that the perpetrator, who was later identified as Anthony Rodriguez ("Rodriguez"),

> "had a metal barrier in his two hands, he was holding on to it. I ran up to him, grabbed his pinky finger . . . I bent it back and I said, 'If you don't let go, I'm going to break it.' He let go, I went around the barrier to help the trooper. I went to grab the guy, the trooper let him go. I put my arm . . . I put my hand around his back to try to flip him over my hip. He grabbed the metal barrier again, he lifted it up, went to hit me in the head with it. I went back like that and my arm was stuck, my hand was stuck under his arm and I could have sworn I got hit with a baseball bat. You know, at that point Georgie Thomson, the sergeant, he come flying in, Patacca, Loughlin, but I had let go at that point, so they just brought him down."

(DE [45] ¶ 30; DE [48] ¶ 12.) Plaintiff did not notice how high the barrier was lifted because he was preoccupied with avoiding it. (DE [48] ¶ 13.)

Thomson, Patacca and Gerald Willis ("Willis"), who is also an MTA PD police officer, were all working at Penn Station on the date of the incident. (DE [48] ¶¶ 36, 46, 51.) At about 12:20 p.m., they each observed two (2) men involved in a dispute, together with a Trooper. (Id.,

¶¶ 36-37, 46, 51.) One of the men involved in the dispute was a Kmart Loss Prevention Officer, who indicated that Rodriguez had stolen store property that he was trying to retrieve. (Id., ¶¶ 36-37, 51.) The situation between the two men then escalated and they started yelling at each other at the entrance to the Kmart store. (Id., ¶ 52.) As one of the men disengaged from the dispute and the other engaged with the Trooper, Willis and Thomson entered the fray. (Id., ¶ 46.) According to Willis, he and Plaintiff arrived on the scene at about the same time. (Id.) Thomson is not sure if Plaintiff became involved in the incident before or after he did, but he knew Plaintiff was involved. (Id., ¶ 46.)

When Willis approached, Rodriguez was on the opposite side of the barrier, which was more or less parallel to the corridor. (DE [48], ¶ 54.) Willis testified that had the GEM cart been there, the barrier would have been used to protect it, but he did not know where or how they stored the barrier when the cart was not there, such as when the incident occurred. (Id.)

According to Thomson, in an effort to avoid being arrested, Rodriguez was able to grab one of the barriers used to cordon off the GEM cart and refused to let go until someone pried his fingers loose. (DE [48] ¶ 47.) Both Thomson and Willis testified that the barrier was moving around and shaking while Rodriguez was grasping it. (Id., ¶¶ 47, 54.) According to Willis, Rodriguez eventually let go of the barrier after his fingers were pried back and Plaintiff threatened to break his finger. (Id., ¶ 54.)

Willis testified that the Trooper who was also present at the scene did "pretty much nothing" aside from giving verbal commands to Rodriguez, *e.g.* telling Rodriguez to let go of the barrier or he would "tase" him. (DE [48], ¶ 53.) However, according to Patacca, the Trooper was on the left side of Rodriguez holding his arm and wrist in an attempt to get him off of the barrier, while Patacca was on the right side holding Rodriguez's right wrist. (Id., ¶¶ 37, 39.)

Although Thomson's memo book contains an entry indicating: "Observe New York State Trooper struggling with subject and attempting to take him into custody. I assisted in that apprehension," the police reports do not make any mention of a Trooper or the barrier. (DE [48], ¶ 50.) Likewise, Willis's memo book makes no reference to the barrier, the Trooper, or the Trooper's warning about tasing Rodriguez. (Id., ¶ 56.)

While Plaintiff was bringing Rodriguez closer to the entrance of the store, Rodriguez continued to hide his hands to prevent being cuffed. (DE [48], ¶ 54.) However, Willis 'memo book indicates that Rodriguez refused to be cuffed and was flailing his arms to prevent cuffing. (DE [48] ¶ 56.) According to Willis, except for the Trooper, they all "went down to the ground" and Willis eventually put his cuffs on Rodriguez. (Id., ¶ 54.) However, Patacca testified that he has a vague recollection of going to the ground with Rodriguez and the Trooper, and also recalls Plaintiff going to the ground, but not with Rodriguez. (Id., ¶ 40.) Patacca has no recollection of ever seeing Willis on the scene, at least until Rodriguez was cuffed. (Id., ¶ 39.)

After looking at his memo book, Willis testified that Loughlin was his partner for the day, but was not involved in this arrest. (DE [48] ¶ 56.) However, according to Patacca, at some point, he heard Plaintiff make a noise, like a grunt, and then heard Loughlin ask Plaintiff if he was okay. (DE [48], ¶ 40.)

Plaintiff does not remember Willis participating in the apprehension of Rodriguez; did not see Willis handcuff Rodriguez; and did not see how Rodriguez was handcuffed. (Id. at 92:8-16, 109:2-4, 110:2-7, 117:14-119:9.) He went to assist the Trooper who was subduing Rodriguez, then Thomson, Patacca and Larry Loughlin ("Loughlin") arrived on the scene and became involved. (Koehler Tr., DE [41-3] at 80:7-12; 92:8-13, 20-22, 117:3-6.) According to

9

Plaintiff, almost every statement in the incident report completed by Willis was inaccurate or false. (Id. at 115:18-117:24.)

> C.    The Number of State Troopers at the Scene

New York State Police Troopers Jeromy M. Furman ("Furman") and Robert M. Dabreau, Jr. ("Dabreau") aver that they were stationed at Penn Station from November 11, 2014 to November 17, 2014. (DE [41-8], ¶ 3; DE [41-9], ¶ 3.) On the date of the incident, Furman and Dabreau were partnered with each other. (Id., ¶ 4.) They were patrolling near the Kmart at Penn Station when they saw two (2) individuals involved in an altercation. (Id.) Furman restrained one of the individuals, who they learned was a security guard employed by Kmart; and Dabreau restrained the other individual, later identified as Rodriguez, who they learned had attempted to shoplift merchandise from the Kmart store. (Id.)

Plaintiff, citing to his memo book, (DE [43-2],) asserts that he "was the first to mention the presence of a single New York State Trooper at the scene of this occurrence." (DE [43] at 7.) Plaintiff's memo book indicates, inter alia, that Plaintiff "did observe NYS Trooper struggling with tall male – went to assist in front of K-Mart." (DE [43-2].) Next to that page of the memo book is a page containing the names, troops and telephone numbers of two (2) New York State Troopers: Furman and "Dabruen" [sic]. According to Plaintiff, his memo book references two (2) Troopers because he believed one of them "was the trooper that was apprehending the subject in front of the Kmart on November 16, 2014." (DE [41-3] at 102:17-103:10.) He got their names from Loughlin, who "went to the troopers and asked for their names." (Id. at 103:11-18.) Plaintiff testified that "There was one trooper there. I don't know where the other trooper was, but there should have been two troopers there." (Id. at 147:15-21; see also Id. at 151:24-152:4.) Even though it ultimately took at least four (4) officers and one (1) trooper to eventually subdue

Rodriguez, Plaintiff speculated that if, at the beginning of the incident, the second trooper had been there, "the back-up would have been there necessary to take the guy down." (Id. at 151:22-24.)

Nowhere in Plaintiff's deposition testimony, memo book or affidavit in opposition to Defendant's motion does he indicate that he ever observed an altercation between Rodriguez and another individual before the Trooper became involved in the incident, nor that he ever observed the Loss Prevention Officer Furman claims he restrained. Plaintiff denies that there was ever a struggle between Rodriguez and a Kmart security officer and claims he never saw a Kmart security officer on the scene at all. (Id. at 115:18-116:4.) However, as indicated above, Plaintiff testified that he only heard someone yell "robbery," then he saw that a Trooper "had a guy in a bear hug," (DE [41-3] at 74:2-5,) so he clearly did not see what transpired prior to Dabreau restraining Rodriguez.

When questioned about whether he would include the name of a New York State Trooper in a person summary on an incident report he filled out, Plaintiff responded: "There was a deal to keep the troopers out of everything, that's why the troopers weren't mentioned. It went on throughout the whole department. Bottom line." (DE [41-3] at 113:13-114:8.)

As indicated above, Thomson assisted in the apprehension of Rodriguez. (DE [41-5] at 52:8-14.) When asked if there was just one Trooper at the scene, Thomson testified, "I really don't remember there being one trooper, but I don't remember everybody that was in Penn Station at the time." (Id. at 49:8-11.) Similarly, Thomson testified that during the incident, he "was more paying attention to the perpetrator [they] were trying to arrest. So anything [he] saw was not [his] primary focus." (Id. at 22:14-16.)

11

Patacca testified that he got involved in the incident when he "saw a K-Mart loss prevention guy and a state trooper dealing with a guy." (DE [41-6] at 11:21-12:2, 13:16-19, 14:4-10.) By the time Patacca arrived on the scene, the barrier "was already involved with the state trooper and the [suspect]," so he did not know how the barrier became involved. (Id. at 15:9-23.) Patacca "only saw that one state trooper." (Id. at 17:7-11.) However, he testified that he did not see "whatever [was] left to the trooper" because he "was concentrating on the suspect himself." (Id. at 21:18-22.)

Patacca's memo book indicates, inter alia, "Two individuals fighting in front of K-Mart. Four units and two New York State Troopers apprehended subject and was brought into base for investigation. Male subject attempted to steal merchandise from K-Mart." (DE [41-6] at 33:9-13; DE [41-12].) When questioned about the apparent inconsistency between his memo book and testimony, Patacca stated, inter alia, "I just remember one helping me out with the subject," and that the incident occurred three and a half years prior to his deposition and, at the time of his deposition, he did not remember a second trooper on the scene. (Id. at 34:9-23.)

The memo book of Loughlin, who seemingly was not deposed in this matter, indicates, in relevant part, that at 12:21 on the date of the incident, he observed Patacca and a security guard wrestling with a man, later identified as Rodriguez. (DE [41-13].) The entry then lists the names and telephone numbers of Furman and Dabreau, as well as the names of Willis, Thomson and Koehler. (Id.)

Willis testified that he noticed a Trooper at the scene, but did not get his name because he "was in the process of trying to arrest a subject who was being violent." (DE [41-7] at 43:5-22.) Afterwards, he "didn't see the necessity for" obtaining the Trooper's name. (Id. at 43:23-44:6.)

Willis did not know if the Trooper was working alone or was with someone else. (Id. at 55:19-23.)

III.   <u>Procedural History</u>

On January 3, 2016, Plaintiff commenced this action against Defendant pursuant to FELA seeking, <u>inter alia</u>, damages for personal injuries he allegedly sustained as a result of Defendant's negligence. On October 16, 2016, Plaintiff filed an amended complaint, (DE [17-2]), which, by electronic order entered March 8, 2017, Judge Spatt accepted for filing, on consent. Issue was joined by the service of an answer to the amended complaint on behalf of Defendant on March 21, 2017 (DE [19]).

Defendant now moves, following the close of discovery, for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure dismissing Plaintiff's claims in their entirety with prejudice; and Plaintiff cross-moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure striking Defendant's affirmative defenses asserting that Plaintiff's alleged injuries and/or damages were, in whole or in part, the result of Plaintiff's (i) own contributory negligence (third affirmative defense); and (ii) culpable conduct, want of care, and/or willful violation of Defendant's safety regulations and/or policies (fourth affirmative defense).

IV.   <u>The Cross-Motions for Summary Judgment</u>

A.   <u>Defendant's Motion</u>

1.   <u>Defendant's Position</u>

Defendant argues that Plaintiff's first remaining assertion, *i.e.*, that it was negligent in storing and leaving unsecured the crowd control barriers, fails because Plaintiff proffers no evidence to support a finding that where or how the barriers were stored was unreasonable or

created an unreasonable risk. According to Defendant, the record demonstrates both that the location of the barriers, which are safety equipment used to control crowds within Penn Station, and the manner in which they are stored were reasonable and that Defendant had no actual or constructive notice that the location of the barriers or the manner in which they were stored created a potential hazard.

Defendant contends that Plaintiff's only other remaining assertion, *i.e.*, that it is negligent because Dabreau, the Trooper involved in Rodriguez's arrest, was allegedly patrolling Penn Station without his partner, is also insufficient as a matter of law. According to Defendant, the record demonstrates that Furman was, in fact, also on the scene and simply out of Plaintiff's view. In any event, the claim would still fail for two (2) additional independent reasons. First, Defendant cannot be held liable for any alleged negligence on the part of the Troopers because Plaintiff cannot proffer any evidence that they were "officers, agents, or employees" of Defendant at the time of the incident, which is necessary under FELA. On the contrary, the Troopers, the MTA PD Captain assigned to Penn Station in November 2014 and the MTA PD patrol supervisor for Penn Station on the day in question all attest that the Troopers were not under the control or authority of the MTA PD.

Second, even if Plaintiff could prove (a) that negligence on the part of the Troopers can somehow be imputed to the MTA and (b) that only one State Trooper was present on the scene, Plaintiff's negligence claim based on the absence of the second Trooper would nonetheless fail because Plaintiff cannot establish the element of causation. Not only has Plaintiff failed to put forward a plausible explanation for how the involvement of the second Trooper would have prevented his injury, he expressly testified: "If there were two troopers fighting with [the suspect], I would have jumped in too." (DE [41-3] at 153:16-18.)

14

2.      Plaintiff's Position

Plaintiff opposes Defendant's motion for summary judgment on the basis that since there is a considerably relaxed standard of proof for determining negligence in FELA cases, as well as a strong federal policy in favor of letting the trier of fact decide these cases, summary judgment dismissing a FELA case cannot be granted unless there is no reasonable basis for a jury to find for the plaintiff.

With respect to his negligence claim regarding the storage and location of the crowd control barriers, Plaintiff argues, inter alia, that a reasonable jury could find from the evidence in the record that Defendant had actual or constructive notice of the dangers of unsecured barriers, yet failed to take precautionary measures to protect its employees; that it was foreseeable that members of the general public would move and/or misuse the barriers; and that Defendant was negligent for continuing to keep the allegedly ineffective barriers unsecured at the location where the incident occurred.

With respect to Plaintiff's claim based upon the purported negligence of the Troopers, Plaintiff contends, inter alia, that there is a genuine dispute of material fact with respect to the number of Trooper present at the scene; that "control over third parties and/or their property is not a relevant defense t[o] an FELA matter," (DE [43] at 14); and that the Troopers 'assertions that they were both present at the scene are not credible.

B.      Plaintiff's Cross Motion

1.      Plaintiff's Position

Plaintiff seeks summary judgment striking Defendant's third and fourth affirmative defenses alleging, inter alia, contributory negligence and culpable conduct on the part of Plaintiff arguing that Defendant cannot establish any negligence or fault on the part of Plaintiff with

respect to this incident; and that New York's "emergency doctrine" precludes a finding of contributory negligence.

### 2. Defendant's Position

Defendant does not oppose, or otherwise address, Plaintiff's cross motion for summary judgment seeking to strike its third and fourth affirmative defenses.

### DISCUSSION

## I. Legal Principles: Standards on Summary Judgment

"Summary judgment is proper 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" ING Bank N.V. v. M/V TEMARA, IMO No. 9333929, 892 F.3d 511, 518 (2d Cir. 2018) (quoting Fed. R. Civ. P. 56(a)). In ruling on a summary judgment motion, the district court must first "determine whether there is a genuine dispute as to a material fact, raising an issue for trial*." McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007); see also Ricci v. DeStefano, 557 U.S. 557, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009) ("On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party *only* if there is a 'genuine ' dispute as to those facts." (emphasis added)). "A fact is material if it might affect the outcome of the suit under the governing law." Baldwin v. EMI Feist Catalog, Inc., 805 F.3d 18, 25 (2d Cir. 2015).

In reviewing the record to determine whether there is a genuine issue for trial, the court must "construe the evidence in the light most favorable to the non-moving party," Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay, 868 F.3d 104, 109 (2d Cir. 2017), and "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." Davis-Garett v. Urban Outfitters, Inc., 921 F.3d

30, 45 (2d Cir. 2019). "A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Pollard v. New York Methodist Hosp., 861 F.3d 374, 378 (2d Cir. 2017). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Ricci, 557 U.S. at 586, 129 S. Ct. at 2677.

"The moving party bears the initial burden of showing that there is no genuine dispute as to a material fact." CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP, 735 F.3d 114, 123 (2d Cir. 2013). "[W]hen the moving party has carried its burden[,] … its opponent must do more than simply show that there is some metaphysical doubt as to the material facts," Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007), and must offer "some hard evidence showing that its version of the events is not wholly fanciful[.]" Miner v. Clinton County, N.Y., 541 F.3d 464, 471 (2d Cir. 2008). The nonmoving party can only defeat summary judgment "by adduc[ing] evidence on which the jury could reasonably find for that party." Lyons v. Lancer Ins. Co., 681 F.3d 50, 56 (2d Cir. 2012). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient to defeat a summary judgment motion[,]" Fabrikant v. French, 691 F.3d 193, 205 (2d Cir. 2012); and "[a] court cannot credit a plaintiff's merely speculative or conclusory assertions." DiStiso v. Cook, 691 F.3d 226, 230 (2d Cir. 2012); see also Flores v. United States, 885 F.3d 119, 122 (2d Cir. 2018) ("While we are required to resolve all ambiguities and draw all permissible factual inferences in favor of the non-moving party, . . . conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment"). Since "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party[,] . . . [i]f the

evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." Anderson, 477 U.S. at 249-50, 106 S. Ct. 2505.

In federal courts, summary judgment is warranted, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). "In such a situation, there can be 'no genuine issue as to any material fact, 'since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 322-23, 106 S. Ct. 2548; see also Chandok v. Klessig, 632 F.3d 803, 812 (2d Cir. 2011) ("Where the undisputed facts reveal that there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements become immaterial and cannot defeat a motion for summary judgment.") "The moving party is 'entitled to a judgment as a matter of law 'because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Celotex, 477 U.S. at 323, 106 S. Ct. 2548. Accordingly, when "the burden of persuasion at trial would be on the nonmoving party . . . the party moving for summary judgment may satisfy his burden of production under Rule 56 in either of two ways: (1) by submitting evidence that negates an essential element of the nonmoving party's claim, or (2) by demonstrating that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." Nick's Garage, Inc. v. Progressive Casualty Ins. Co., 875 F.3d 107, 114 (2d Cir. 2017).

When considering cross motions for summary judgment, courts must "assess each motion on its own merits and [ ] view the evidence in the light most favorable to the party opposing the

18

motion, drawing all reasonable inferences in favor of that party." <u>Bey v. City of New York</u>, 999 F.3d 157, 164 (2d Cir. 2021).

With these standards in mind, the Court turns to discuss the legal principles to be applied and the merits of the motion.

II.  <u>Defendant's Motion</u>

A.  <u>Law Applicable to Defendant's Claims: FELA</u>

FELA provides, in pertinent part: "Every common carrier by railroad while engaging in commerce between any of the several States or Territories, or between any of the States and Territories . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier. . . ." 45 U.S.C. § 51. "[T]he general congressional intent [in enacting FELA] was to provide liberal recovery for injured workers." <u>Kernan v. Am. Dredging Co.</u>, 355 U.S. 426, 432, 78 S. Ct. 394, 2 L.Ed.2d 382 (1958).

"In FELA actions, the plaintiff must prove the traditional common law elements of negligence: duty, breach, foreseeability, and causation." <u>Tufariello v. Long Island R. Co.</u>, 458 F.3d 80, 87 (2d Cir. 2006). "At the same time, the plaintiff's burden in making a showing of causation and negligence is lighter under FELA than it would be at common law because the theory of FELA is that where the employer's conduct falls short of the high standard required of him by the Act and his fault, in whole or in part, causes injury, liability ensues." <u>Id.</u>

However, "[w]hile there is a considerably more relaxed standard of proof for determining negligence in FELA cases, . . . and a strong federal policy in favor of letting juries decide these cases, . . . FELA does not make an employer strictly liable for workplace injuries and, therefore,

requires that claimants must at least offer some evidence that would support a finding of negligence." Sinclair v. Long Island R.R., 985 F.2d 74, 76-77 (2d Cir. 1993). Rather, FELA's relaxed standard of proof "mean[s] that juries have more latitude to infer negligence than at common law, such that the question can rarely be taken from them and decided by the court as a matter of law." Coale v. Metro-North Commuter R.R. Co., 621 F. App'x 13, 14 (2d Cir. July 13, 2015) (summary order).

"It is indisputable that the [MTA] ha[s] a duty to provide its employees with a safe workplace," Tufariello, 458 F.3d at 91, "which it has breached if it knew or should have known of a potential hazard in the workplace, and yet failed to exercise reasonable care to inform and protect its employees." Id." Reasonable care is determined in light of whether or not a particular danger was foreseeable." Syverson v. Consol. Rail Corp., 19 F.3d 824, 826 (2d Cir. 1994). "[W]hether the railroad used reasonable care in furnishing its employees a safe place to work is normally a question for the jury . . . And the right of the jury to pass on this issue must be liberally construed." Sinclair, 985 F.2d at 77. Accordingly, under FELA, a "case must not be dismissed at the summary judgment phase unless there is absolutely no reasonable basis for a jury to find for the plaintiff." Gadsden v. Port Auth. Trans-Hudson Corp., 140 F.3d 207, 209 (2d Cir. 1998).

"Reasonable foreseeability of harm . . . [is] an essential ingredient of FELA negligence," CSX Transp., Inc. v. McBride, 564 U.S. 685, 703, 131 S. Ct. 2630, 180 L. Ed. 2d 637 (2011), which "requires proof of actual or constructive notice to the employer of the defective condition that caused the injury." Sinclair, 985 F.2d at 77; see also Ulfik v. Metro-N. Commuter R.R., 77 F.3d 54, 58 (2d Cir. 1996) ("The touchstone of this negligence inquiry is the issue of foreseeability—whether or not [the MTA] knew or should have known of the potential hazard.")

20

Additionally, "the element of notice is satisfied by a defendant's creation of a dangerous condition." Corsale v. Delaware & Hudson Ry. Co., Inc., No. 1:08-cv-572, 2010 WL 3907827, at *4 (N.D.N.Y. Sept. 30, 2010).

A defendant's duty is "measured by what a reasonably prudent person would anticipate as resulting from a particular condition--defendant's duties are measured by what is reasonably foreseeable under like circumstances--by what in the light of the facts then known, should or could reasonably have been anticipated." Gallick v. Baltimore & O. R.R. Co., 375 U.S. 108, 118, 83 S. Ct. 659, 9 L.Ed.2d 618 (1963). "[I]f a person has no reasonable ground to anticipate that a particular condition would or might result in a mishap and injury, then the party is not required to do anything to correct the condition." CSX Transp., 564 U.S. at 703, 131 S. Ct. 2630.

"To establish causation in a common law negligence action, a plaintiff generally must show that the defendant's conduct was a substantial factor in bringing about the harm. Tufariello, 458 F.3d at 87. However, "[g]iven the breadth of the phrase 'resulting in whole or in part from the [railroad's] negligence, 'and Congress 'humanitarian and remedial goals, [the Supreme Court] ha[s] recognized that, in comparison to tort litigation at common law, "a relaxed standard of causation applies under FELA." CSX Transp., 564 U.S. at 691-92, 131 S. Ct. 2630; see also Tufariello, 458 F.3d at 87 ("Under the federal common law of FELA actions, . . . the plaintiff carries a lighter burden.") "Under [FELA] the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought." Rogers v. Missouri Pac. R. Co., 352 U.S. 500, 506, 77 S. Ct. 443, 77 S. Ct. 443 (1957); see also CSX Transp., 564 U.S. at 703-04, 131 S. Ct. 2630 ("If negligence is proved . . . and is shown to have played any part, even the slightest, in producing the injury, . . . then the carrier is answerable in damages even if the extent

of the injury or the manner in which it occurred was not probable or foreseeable.")

As with foreseeability, "the right of the jury to decide the issue of causation must be most liberally viewed," Tufariello, 458 F.3d at 88, because "Congress vested the power of decision in [FELA] actions exclusively in the jury in all but the infrequent cases where fair-minded jurors cannot honestly differ whether fault of the employer played any part in the employee's injury." Rogers, 352 U.S. at 510, 77 S. Ct. 443. "Therefore, only in instances where reasonable jurors could reach only one conclusion may the court take the determination from the jury and decide the question as a matter of law." Williams v. Long Island R.R. Co., 196 F.3d 402, 407 (2d Cir. 1999) ("The Supreme Court has said, based on the explicit language of the statute, that with respect to causation, a relaxed standard applies in FELA cases. . . .")

    B.    <u>Disposition of Defendant's Motion</u>

        1.    <u>The Unsecured Barriers</u>

Defendant contends that Plaintiff's claim alleging that it was negligent because the barrier that Rodriguez allegedly grabbed and jerked "was left unsecured and in a location where it could be used as a weapon by a member of the public" in Penn Station, (DE [41-1], ¶ 9,) fails because Plaintiff cannot proffer any evidence demonstrating that the condition of the barrier created an unreasonable risk of harm or that Defendant had actual or constructive notice of a defective condition that allegedly caused his injury. In other words, Defendant only challenges the element of reasonable foreseeability with respect to this claim.

Plaintiff claims that "the negligence of his employer arises on account of the presence of the loose unsecured stanchion gates had [*sic*] at the accident location at the time of the incident that were then not being used to protect the GEM car, such that it was allowed to come into the hands of the perpetrator who attempted to move it in such a manner as would have caused the

metal stanchion gate to hit plaintiff in the face as he dragged and/or lifted it towards him."
(Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment,
appearing as DE [43], at 7.)

The sole issue with respect to this claim is whether Defendant knew or should have
known that the unsecured barriers stored and/or used in an area accessible to the general public
created an unreasonable risk of harm and, if so, "whether an employer using reasonable care
should have investigated further or taken other steps to inform and protect its employees,"
Gallose v. Long Island R. Co., 878 F.2d 80, 85 (2d Cir. 1989), *e.g.*, by securing the barriers so
that they could not be moved, lifted or misused by the general public or storing the GEM cart
and barriers in a location that was not accessible to the public. "The issue is factual and as with
all factual issues under the FELA, the right of the jury to pass on this issue must be liberally
construed." Gadsden, 140 F.3d at 209.

The case Murphy v. Metropolitan Transp. Auth., 548 F. Supp. 2d 29 (S.D.N.Y. 2008),
which Defendant contends is a "strikingly similar" case in which "Judge McMahon held that
'[g]iven the unlikelihood of the injury suffered by Plaintiff and the benefit conferred by the
presence of the stanchions (as well as the attendant costs in removing them), . . . as a matter of
law, the MTA was not negligent in the placement of the stanchions, and that Plaintiff has raised
no issue of material fact that could be resolved in favor that would change the outcome'" (DE
[40] at 11,) is distinguishable. In Murphy, the plaintiff, who worked for the MTD PD and
primarily worked the late shift at Penn Station, was injured while responding to a call requesting
an additional unit on a scene, when the path he had charted across the terminal was "blocked by
an arrangement of stanchions—rope-supporting poles put in place to form lines in front of the
ticket counters— [and he] made a sharp pivot mid-run, in order to head diagonally in another

23

direction." Id. at 34. While making that maneuver, the plaintiff "felt an unfamiliar 'pop 'in his knee." Id. The plaintiff alleged "that the MTA provided an unsafe work environment when it negligently placed the stanchions that caused him to make the sudden pivot that he claims injured his knee." Id. at 37.

Judge McMahon held that unlike "'typical 'workplace hazards," such as a puddle of water, a patch of ice, a pile of debris, etc., which "serve no purpose . . . [and] ought to be removed," Murphy, 548 F. Supp. 2d at 38,

> "the stanchions are purposely placed, and for a good reason. The stanchions shepherd what might otherwise be a throng of people into a line. If anything, their presence renders the waiting area safer rather than more dangerous. Plaintiff has suggested no way in which the arrangement or placement of these stanchions is unreasonable or creates an unreasonable risk. For instance, Plaintiff does not allege, or present any evidence, that the stanchions were arranged in a manner that made them unnecessarily dangerous.
>
>          ***
>
> The second major difference between these stanchions and the typical workplace hazard is that the existence of the alleged 'hazard' was well known to the Plaintiff. The fact that a patch of 'black' ice is nearly invisible to casual observation greatly increases the risk that someone will slip on it; likewise, a non-apparent defect in a switch significantly increases the risk that someone will be injured when attempting to throw it.
>
> Here, by contrast, any risk created by the placement of the stanchions was significantly reduced by their plain visibility. Plaintiff does not allege, or present any evidence, that the stanchions were out of their usual position. This factor is especially significant in light of the fact that Murphy worked in their close proximity for a number of years, and was clearly on notice as to both the existence of the stanchions and their configuration.
>
> Taken together, the evidence shows that these stanchions presented only a very slight risk that a person would be injured in his attempt to avoid them; and that the cost of removing these stanchions—and then replacing them several times a day, depending on whether or not the terminal was at some undefined level of busy-ness—would be excessive in light of that risk. And of course the biggest cost is the loss of the benefit these stanchions provide. It appears extremely likely that the stanchions—and the function they serve of ordering crowds into lines rather than allowing them to blossom haphazardly in all directions—actually reduce the risk to

> employees like Plaintiff who may encounter the perceived need to run. And this just points out the absurd corollary of plaintiff's theory with respect to the stanchions: namely that the MTA should be held liable for failing to provide Murphy with a clear running path between points in Penn Station at 9:30 pm on a Friday night. Tort law will not incent people to do the impossible, or hold them liable for failing to achieve it."

<u>Murphy</u>, 548 F. Supp. 2d at 38-39.

Unlike <u>Murphy</u>, Plaintiff in this case proffered evidence from which a jury may reasonably infer that the barrier were stored and/or used in a manner that made them unnecessarily dangerous, *e.g.*, in an area accessible to the general public and either unsecured, if being stored at the time of the incident, or not interlocked, if being used to guard the GEM cart at the time of the incident. Moreover, unlike the plaintiff in <u>Murphy</u>, who was a twenty-year veteran of the MTA PD, and whose primary post was at Penn Station, *id.* at 33, Plaintiff's regular post was in the Garden City District and he only worked at Penn Station approximately ten (10) times in 2014. (DE [48] ¶ 8.) Thus, he did not work in close proximity to the barriers for many years such that he can be said to have clear notice of the manner in which they were stored or used. Moreover, the fact that the barriers were unsecured when not in use, and not interlocked when being used to guard the GEM cart, is not as plainly visible as a line of rope-supporting poles "in their usual position" would be to a twenty-year veteran of the MTA PD whose primary post was Penn Station.

Contrary to <u>Murphy</u>, this is not an instance where reasonable jurors could reach only one conclusion. Rather, a jury could reasonably conclude that Defendant created, or had actual or constructive notice of, the condition and should have foreseen the increased risk of injury caused by an unsecured barrier that is stored and/or used in an area accessible to the public. <u>See, e.g.</u> <u>Corsale</u>, 2010 WL 3907827, at *4 (denying summary judgment because the jury could reasonably find that the defendant "failed to properly tamp and level the walkway so that it could

25

safely support weight—thus creating the dangerous condition—[and] could also find that [the Defendant] had the requisite notice of that condition.") Plaintiff is not required to specifically demonstrate that the unsecured barriers, themselves, were dangerous. See Gallick, 372 U.S. at 117-19, 83 S. Ct. 659. In sum, with respect to the unsecured barriers stored and/or used in an area accessible to the general public, "exactly what [Defendant] knew or should have known, and whether [it] exercised reasonable care in light of its knowledge, are questions of fact upon which reasonable jurors could differ." Sinclair, 985 F.2d at 77. Accordingly, the branch of Defendant's motion seeking summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure dismissing Plaintiff's negligence claim based upon the location of the barriers and/or the manner in which they were stored is DENIED.

### 2. Alleged Misconduct of the Troopers

Defendant contends that Plaintiff's claim that the MTA was negligent "in permitting the officer and/or New York State Trooper [*sic*] to be on assignment in the field without his assigned partner; [and] in permitting the officer and/or New York State Trooper [*sic*] to become involved in an arrest and/or altercation while on assignment in the field without his assigned partner," (DE [17-2] ¶ 10,) fails because (1) while Plaintiff only saw one State Trooper, that does not contradict or rebut the clear evidence in the record demonstrating that there were actually two State Troopers on the scene; and (2) even assuming, arguendo, that Dabreau was working in the field without his partner, Plaintiff cannot (a) put forward any evidence to suggest that the Troopers were "agents" of Defendant such that it can be held liable for their purported negligence, or (b) establish causation because, by his own admission, he would have acted in the very same way even if both Troopers had been involved in the altercation with Rodriguez.

### a. Agency

Since it is undisputed that the Troopers were not officers or employees of Defendant, the only issue presented is whether they were agents of Defendant within the meaning of FELA.

"[I]in interpreting the FELA, [courts] need not depend upon common-law principles of liability." Sinkler v. Missouri Pac. R. Co., 356 U.S. 326, 329, 78 S. Ct. 758, 2 L.Ed.2d 799 (1958). "[I]t was the conception of [FELA] that the railroad was a unitary enterprise, its economic resources obligated to bear the burden of all injuries befalling those engaged in the enterprise arising out of the fault of any other member engaged in the common endeavor." Id. at 330. Accordingly, "an accommodating scope must be given to the word 'agents' to give vitality to the standard governing the liability of carriers to their workers injured on the job." Id. at 330-31.

"[W]hen a railroad employee's injury is caused in whole or in part by the fault of others performing, under contract, operational activities of his employer, such others are 'agents' of the employer within the meaning of [Section 1 of FELA]." Sinkler, 356 U.S. at 331-32, 78 S. Ct. 758. "In other words, the employer railroad is liable for the negligence of a third person, hired by the railroad, to perform operational activities required to carry out railroad functions." Vann v Long Island R.R. Co., 131 Misc. 2d 1082, 502 N.Y.S.2d 596, 599 (N.Y. Sup. Ct. 1986), aff'd, 133 A.D.2d 624 (N.Y. App. Div. 1987).

"Courts have applied generous interpretations of Sinkler in determining what constitutes the 'operational activities 'of a railroad." Mele v. Metro. Transp. Auth., No. 04Civ.03661, 2006 WL 2255080, at *4 (S.D.N.Y. Aug. 4, 2006); see also Thomas v. Grigorescu, 582 F. Supp. 514, 517 (D.C.N.Y. 1984) (citing cases), aff'd, 751 F.2d 371 (2d Cir. Oct. 1, 1984). However, in each case, as in Sinkler, the negligent party was operating under a contract with the railroad, which hired them. See Thomas, 582 F. Supp. at 517; see also Vann, 502 N.Y.S.2d at 599 ("In all . . . cases[] where the courts have found that an independent contractor was an agent of the railroad

for the purposes of the Federal Employers Liability Act, the railroad chose the entity for its employee to use. In those cases, the courts in construing the statute, imputed liability for the acts of the independent contractor under the broadly defined term of agent in 45 U.S.C.A. Section 51.") "This is a critical feature of liability, for it is the contract which permits a finding that the negligent party was the 'agent' of the employer. In the absence of such a contract, there is no basis for liability under the FELA." Thomas, 582 F. Supp. at 517. "A major reason that the existence of a specific contract fairly serves to subject the carrier to liability for the negligence of one otherwise outside its control is that in contracting with a particular third party the carrier forces its employees to work near or be served by the third party. Because by virtue of its contract the employer requires its employees to suffer the tender ministrations of the third party, it can fairly be asked to share the burden of liability if its contractually created agent is careless." Id. at 518.

Unlike cases which find that a genuine issue of material fact exists as to whether a third party was an "agent" of the MTA within the meaning of Section 1 of FELA, such that their negligence can be imputed on to the defendant, see, e.g. Mele, 2006 WL 2255080, at *4 (finding that a reasonable jury could find that cleaning and maintaining the MTA's corporate headquarters was within the "operational activities" of the MTA and that the entity performing cleaning and janitorial services for the MTA under contract was an "agent" of the MTA under FELA), there is no evidence in the record from which a jury may reasonably infer that the Troopers were performing operational activities under contract with Defendant or that the MTA hired them to perform any activity, much less an operational activity of the MTA. See, e.g. Ward v. Atl. Coast Line R. Co., 362 U.S. 396, 397-98, 80 S. Ct. 789, 4 L. Ed. 2d 820 (1960) (holding that no jury question was presented on the issue of whether a third party was the railroad's "agent" within the

meaning of FELA because, unlike Sinkler, in which the railroad engaged an independent contractor to perform operational activities required to carry out the franchise, it could not be said "under the proofs that the [third party] was engaged in furthering the operational activities of respondent. . . . Even the use of the siding by local farmers in harvest time to load [the railroad's] cars with watermelons . . . [was] not at the instance of the railroad); Thomas, 582 F. Supp at 517-18 (granting summary judgment in favor of the railroad because the negligent party was not operating under a contract with the railroad); Vann, 502 N.Y.S.2d at 599 (finding that an independent contractor was not an agent of the railroad where the railroad never chose the independent contractor to perform services on behalf of its employee.)

Lennon testified that neither the Troopers, nor their ranking officer, report to the MTA, and that Defendant has no control over the Troopers. (Lennon Tr., DE [41-4] at 45:12-46:2). Similarly, Thomson testified that, as the patrol supervisor at Penn Station on the date of the incident, he had no control or authority over the Trooper involved in the arrest of Rodriguez. (Thomson Tr., DE [41-5] at 80:8-12.) Likewise, Furman and Dabreau both aver that when they were stationed at Penn Station, their immediate supervisor was a sergeant with the New York State Police; and that they never reported to anyone employed by the MTA PD, or any other agency or company. (DE [41-8], ¶ 5 and [41-9], ¶ 6.)

The cases cited by Plaintiff are distinguishable. Plaintiff cites Greene v. Long Island R.R. Co., 280 F.3d 224 (2d Cir. 2002), in support of his contention that evidence indicating "that the MTA PD processed the arrests of the New York State Troopers . . . sufficiently establishes the basis for the jury to find a 'joint venture 'that was had as between the two police departments who patrolled the same property at Penn Station, such that the negligence of the New York State Troopers, may properly be attributable to the MTA PD under the FELA." (DE [43] at 11.)

29

However, the issue in <u>Greene</u> was whether the MTA was an "interstate common carrier by railroad" subject to Section 1 of FELA, such that the plaintiff, a police officer employed by the MTA PD to provide security for parking lots at stations maintained by the LIRR and owned and operated by the MTA authority, would be entitled to the benefits of FELA. The Court held that "with respect to the police officers whom MTA employs to provide security for LIRR railroad parking lots, MTA 'operates 'an 'interstate common carrier by railroad 'within the meaning of FELA." <u>Id.</u> at 240. Indeed, the Court explicitly indicated in <u>Greene</u> that it "express[ed] no view as to whether Greene was injured by reason of negligence on the part of any MTA officers, agents, or employees," <u>id.</u>, which is the very issue presented in this case.

The issue in <u>*Shenker v. Baltimore & O. R.R. Co.*</u>, 374 U.S. 1, 5, 83 S. Ct. 1667, 10 L.Ed.2d 709 (1963), was whether the railroad which employed the plaintiff was, itself, negligent in failing to inspect for defects rail cars owned by another railroad, on which the employing railroad's employees were required to work. <u>Id.</u> at 7, 10. The railroad in that case was held liable to its employee by virtue of its uncontested failure to inspect the cars for defects before requiring its employees to service them. <u>Shenker</u>, 374 U.S. at 10, 83 S. Ct. 1667. That case did not address the issue, presented here, of whether, under FELA, a carrier may be held liable for injuries to its employees caused solely by the negligence of third parties who were not its officers, agents or employees.

Likewise, the issue in <u>Lillie v. Thompson</u>, 332 U.S. 459, 68 S. Ct. 140, 92 L. Ed. 2d (1947) (per curiam), was whether the interstate carrier, itself, was negligent in requiring a 22-year old female telegraph operator to work alone between 11:30 p.m. and 7:30 a.m. in a building situated in an isolated part of the carrier's railroad yards when the carrier "had reason to know the yards were frequented by dangerous characters," yet failed to light the building and

surroundings, or to guard or patrol it in any way. Id. at 460-61. The Supreme Court reversed summary judgment in favor of the carrier, finding that the plaintiff "alleged in effect that [the carrier] was aware of conditions which created a likelihood that a young woman performing the duties required of petitioner would suffer just such an injury as was in fact inflicted upon her. That the foreseeable danger was from intentional or criminal misconduct is irrelevant; respondent nonetheless had a duty to make reasonable provision against it." Id. at 461-62. In other words, there was evidence of direct negligence on the part of the defendant in that case, *i.e.*, that the railroad knew or should have known about the potential danger to the plaintiff but did nothing to prevent it. In the instant case, Plaintiff has not established, inter alia, that the MTA knew or should have known either that a New York State Trooper would "wrongfully abandon his post and fellow Trooper," (DE [43] at 13), or would "unexpectedly let go of the perpetrator before he was properly restrained and subdued," (DE [43] at 15), and failed to protect or inform its employees against such misconduct.

The sole issue presented in Schneider v. Nat'l R.R. Passenger Corp., 854 F.2d 14 (2d Cir.1988), was "whether employment, for purposes of the Federal Employers' Liability Act ("FELA"), 45 U.S.C. §§ 51–60 (1982), ceases the moment an employee leaves her work station at the end of a day's work, even though at the time of her injury she has not left the employer's premises." Id. at 15. Thus, that case is entirely distinguishable from the instant case.

In *Burns v. Penn Cent. Co.*, 519 F.2d 512 (2d Cir. 1975), the decedent was a longtime employee of the defendant who was shot and killed when he followed the defendant's "customary practice of assuming a position on the bottom step in the open doorway" to prevent attempts by passengers to board or leave the train between stations in the Harlem area. Id. at 513. "Unbeknown to [the decedent] and the other employees on the train, there had in the last ten

months been four stonings of passenger cars within three blocks of the site of Burns' slaying and an additional four stonings within 25 blocks," even though the defendant's records evidenced its knowledge of the stonings. Id. at 513-14. "Whether, in light of this knowledge of the stonings and the general conditions in the Harlem area, the defendant was obliged to take measures to ensure that its employees were not, as [the decedent] in fact was, unwittingly victimized [was] the subject of the complaint under review." Id. at 514. The Court found that a jury could reasonably find that the defendant could have foreseen the type of injury incurred and, thus, was itself negligent in the fulfillment of its duties to its employee under the FELA "[b]ased on the railroad's actual knowledge of stonings in the vicinity in recent months and its constructive (and indubitably actual) knowledge of the generally dangerous conditions prevailing in the neighborhood in which the fatality transpired." Id. at 514-15.

In sum, the cases cited by Plaintiff in support of its claim that the MTA can be held liable for the actions of the Troopers sought recovery for the direct negligence of the carrier, whereas Plaintiff is claiming recovery, in essence, under a respondeat superior theory, i.e., on the basis that his injuries resulted from the negligence of an officer, agent or employee of the MTA and, thus, can be imputed to the MTA. Cf. Lee v. Transp. Commc'ns Union, 734 F. Supp. 578, 580 (E.D.N.Y. 1990) ("In an effort to avoid suits between co-workers, Congress has provided a remedy to an injured employee of a 'common carrier by railroad', by imposing liability upon the employer based on the doctrine of respondeat superior. Thus, even though the statute renders a railroad liable for the negligence of its 'officers, agents or employees '(45 U.S.C. § 51), the FELA imposes liability only on the railroad, and not its agents or employees.")

Plaintiff does not allege, much less establish, any direct negligence by the MTA with respect to the conduct of the Troopers. Nor is there any evidence from which a rational jury

could reasonably find, inter alia, that the MTA knew or should have known that the Troopers would engage in the misconduct alleged or otherwise posed a hazard to its employees from which it had a duty to protect them. Accordingly, the branch of Defendant's motion seeking summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure dismissing Plaintiff's negligence claim based upon the purported misconduct of the Troopers is GRANTED and Defendant is granted judgment as a matter of law dismissing that claim.[5]

III.   Plaintiff's Cross Motion

A.   Law Applicable to Plaintiff's Claims: FELA

FELA provides, in relevant part, that with an exception not relevant here, "[i]n all actions . . . brought against any such common carrier by railroad under or by virtue of any of the provisions of this chapter to recover damages for personal injuries to an employee . . . the fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee. . . ." 45 U.S.C. § 53. "[T]he same standard of causation applies to railroad negligence under Section 1 as to plaintiff contributory negligence under Section 3." Norfolk S. Ry. Co. v. Sorrell, 549 U.S. 158, 171, 127 S. Ct. 799, 166 L.Ed.2d 638 (2007). As an affirmative defense, "the burden of proving contributory negligence is on the defendant." Hose v. Chicago Nw. Transp. Co., 70 F.3d 968, 978 (8th Cir. 1995); see generally G4S Int'l Emp. Servs. (Jersey), Ltd. v. Newton-Sealey, 975 F.3d 182, 187 (2d Cir. 2020) ("It is well-established that a defendant [ ] bears the burden of proving its affirmative defense.")

B.   Disposition of Plaintiff's Cross Motion

Defendant's third affirmative defense alleges that "[w]hatever injuries and/or damages

---

[5] In light of this determination, it is unnecessary to consider Defendant's remaining contentions.

33

were sustained by the Plaintiff at the time and place alleged in the Amended Complaint were in whole or in part the result of Plaintiff's own contributory negligence." (DE [41-2], ¶ 3.) Defendant's fourth affirmative defense alleges that "[w]hatever injuries and/or damages were sustained by the Plaintiff at the time and place alleged in the Complaint were in whole or in part caused by the Plaintiff's own culpable conduct, by the Plaintiff's want of care, and/or by the Plaintiff's willful violation of Defendants 'safety regulations and/or policies." (Id., ¶ 4.)

Initially, since Defendant failed to oppose, or otherwise address, Plaintiff's cross motion, it has abandoned its third and fourth affirmative defenses. See, e.g. Fendi Adele S.R.L. v. Filene's Basement, Inc., 696 F. Supp. 2d 368, 381 (S.D.N.Y. 2010).

In any event, the record is devoid of any evidence from which a rational jury could reasonably find that Plaintiff was in any way contributorily negligent or at fault in causing his injuries. See, e.g. Hose, 70 F.3d at 978 ("[W]hen there is no evidence from which a jury could reasonably find a lack of due care by the plaintiff, it is reversible error to submit the issue of contributory negligence to the jury.") Accordingly, Plaintiff's cross motion is GRANTED, and Plaintiff is granted judgment as a matter of law striking Defendant's third and fourth affirmative defenses.

CONCLUSION

For the foregoing reasons, the branch of Defendant's motion seeking summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure dismissing Plaintiff's negligence claim based upon the location of the barriers and/or the manner in which they were stored is DENIED; the branch of Defendant's motion seeking summary judgment dismissing Plaintiff's negligence claim based upon the purported negligence of the Troopers is GRANTED and Defendant is granted judgment as a matter of law dismissing that claim with prejudice; and

34

Plaintiff's unopposed cross motion for summary judgment striking Defendant's third and fourth affirmative defenses is GRANTED and Plaintiff is granted judgment as a matter of law striking Defendant's third and fourth affirmative defenses.

**SO ORDERED.**

/s/ Anne Y. Shields
Anne Y. Shields
United States Magistrate Judge

Dated: Central Islip, New York
        August 17, 2021