UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
ROBERT KOEHLER,

                       Plaintiff,

                                  **MEMORANDUM AND**
                                  **OPINION**
            -against-                   16-CV-03 (AYS)

METROPOLITAN TRANSPORTATION
AUTHORITY,

                       Defendant.
-------------------------------------------------------------X
**SHIELDS, Magistrate Judge:**

      Plaintiff Robert Koehler ("Plaintiff" or "Koehler") commenced this action against

defendant Metropolitan Transportation Authority ("Defendant" or the "MTA") pursuant to the

Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 5l, et seq. Koehler sought damages for

injuries sustained in 2014 while he was working as a police officer for the MTA. Prior to trial

this Court ruled on Defendant's motion for summary judgment, and the case proceeded to trial on

the issue of negligence. See Koehler v. MTA, 2021 WL 3634777 (E.D.N.Y. Aug. 17, 2021). A

jury trial commenced on September 13, 2022. On September 15, 2022, the jury found in favor of

Plaintiff in the amounts of $375,000 for lost wages and overtime; $62,500 in past physical pain

and suffering and $62,500 for future pain and suffering, for a total award of $500,000.

      Presently before the Court are Defendants' post-trial motions pursuant to Rules 50, 59

and 60 of the Federal Rules of Civil Procedure. Defendant seeks judgment as a matter of law,

and/or a new trial. In the alternative, the MTA seeks remittitur of the $375,000 award of

economic damages. See Docket Entry herein ("DE") 79. For the reasons set forth below the

motions are denied.

BACKGROUND

I.      The Motion for Summary Judgment and Plaintiff's Theory of the Case

Support for a plausible theory of liability was a necessary component of the decision denying summary judgment. Much of that theory (which the Court held a reasonable jury could find) focused on the storage of an MTA vehicle used to navigate around Penn Station. That vehicle is similar to a golf cart and referred to as a "GEM" cart. See Koehler, 2021 WL 3634777, at *2.  At the summary judgment stage, Plaintiff stated that the GEM cart was safeguarded by the use of metal barriers, referred to as "stanchions" or "gates." Id. It was also stated that these barriers were "stored in the recessed area near the Kmart store where the GEM cart was stored." Id.

The incident that resulted in Plaintiff's injury occurred while he was helping to effectuate the arrest of an alleged shoplifter who was exiting a K-Mart store (the "K-Mart") located in Pennsylvania Station ("Penn Station"). Prior to Plaintiff's involvement, the suspect was resisting the efforts of other officers by holding on to a metal barrier that was in front of the K-Mart. Plaintiff saw what was going on and came over to help. Koehler, 2021 WL 3634777 at *2-5. As to his claim of negligence, Plaintiff focused on the "storage and location of the crowd control barriers." He argued, inter alia, "that a reasonable jury could find from the evidence in the record that Defendant had actual or constructive notice of the dangers of unsecured barriers, yet failed to take precautionary measures to protect its employees; that it was foreseeable that members of the general public would move and/or misuse the barriers; and that Defendant was negligent for continuing to keep the allegedly ineffective barriers unsecured at the location where the incident occurred." Koehler, 2021 WL 3634777 at *7 (emphasis added). More particularly, Plaintiff argued that Defendant was negligent because a metal barrier was "grabbed and jerked" and was

"left unsecured and in a location where it could be used as a weapon by a member of the public" in Penn Station . . . ." Koehler, 2021 WL 3634777 at *11. Focusing on the use of stanchions that were, at the time, not being used to protect the GEM cart, Plaintiff argued that such stanchions were "allowed to come into the hands of the perpetrator who attempted to move it in such a manner as would have caused the metal stanchion gate to hit plaintiff in the face as he dragged and/or lifted it towards him." Id. Defendant opposed summary judgment mainly on the theory that no metal barrier had ever been used as a weapon. It was argued that the barriers were necessary to protect the GEM cart from tampering by members of the public, and that no reasonable jury could find the necessary elements of negligence.[1]

Based upon the facts and arguments above, and in light of the FELA standard of liability, the Court denied the motion for summary judgment. In particular, the Court held that Plaintiff had "proffered evidence from which a jury may reasonably infer that the barriers were stored and/or used in a manner that made them unnecessarily dangerous, e.g., in an area accessible to the general public and either unsecured, if being stored at the time of the incident, or not interlocked, if being used to guard the GEM cart at the time of the incident." 2021 WL 3634777 at *12 (emphasis added). In the context of the present motions Plaintiff argues that facts developed at trial allowed a reasonable jury to find precisely what the Court stated could reasonably be found. Defendant disagrees. Before turning to disposition of the motion the Court discusses briefly the FELA standard that Plaintiff was required to meet.

---

[1]      As discussed below, counsel for both parties used the terms "stanchion", "barrier" and "gate" interchangeably and without definition throughout the trial. The Court has no doubt that jurors did their best to keep up, despite this unfocused approach.

II.     FELA Standard of Liability

The parties have no dispute as to the FELA standard of liability. That standard was: (1) applied at the summary judgment phase, (2) instructed at trial, and (3) applies in the context of the present motions. While the Court need not review those standards in detail it notes that to prevail in a FELA case "the plaintiff must prove the traditional common law elements of negligence: duty, breach, foreseeability, and causation." Tufariello v. Long Island R. Co., 458 F.3d 80, 87 (2d Cir. 2006). While there is undoubtedly a "considerably more relaxed standard of proof for determining negligence in FELA cases, . . . and a strong federal policy in favor of letting juries decide these cases, . . . FELA does not make an employer strictly liable for workplace injuries and, therefore, requires that claimants must at least offer some evidence that would support a finding of negligence." Sinclair v. Long Island R.R., 985 F.2d 74, 76-77 (2d Cir. 1993). However, in the context of a FELA case, "juries have more latitude to infer negligence than at common law, such that the question can rarely be taken from them and decided by the court as a matter of law." Coale v. Metro-North Commuter R.R. Co., 621 F. App'x 13, 14 (2d Cir. July 13, 2015) (summary order).

With respect to duty, Defendant has an "indisputable" duty to provide Plaintiff with a safe workplace, Tufariello, 458 F.3d at 91. That duty includes the duty to exercise reasonable care to inform and protect employees of potential workplace hazards of which it knew or should have known. "Reasonable care is determined in light of whether or not a particular danger was foreseeable." Syverson v. Consol. Rail Corp., 19 F.3d 824, 826 (2d Cir. 1994). Foreseeability of harm, which is an essential FELA element, CSX Transp., Inc. v. McBride, 564 U.S. 685, 703, 131 S. Ct. 2630, 180 L. Ed. 2d 637 (2011) "requires proof of actual or constructive notice to the employer of the defective condition that caused the injury." Sinclair, 985 F.2d at 77. The jury

question in a FELA case is to decide simply "whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought." Rogers v. Missouri Pac. R. Co., 352 U.S. 500, 506, 77 S. Ct. 443, 1 L. ED. 2d 493 (1957); see also CSX Transp., 564 U.S. at 703-04, 131 S. Ct. 2630.

III.   The Trial

Four fact witnesses and one expert testified at trial. In addition to the Plaintiff, the jury heard the live factual testimony of MTA police officers Henry Lennon ("Lennon") and George Thomas ("Thomas"). Lennon is now retired. Thomas remains employed by the MTA. The jury also heard deposition testimony of MTA police officer Rafael Patacca ("Patacca"). Finally, the MTA offered the expert testimony of Dr. Hobeika ("Hobeika"), an orthopedic surgeon. Hobeika's testimony was directed only to physical damages, not negligence. Because Defendant's remittitur argument is addressed only to the jury award of economic damages, review of Hobeika's testimony is not necessary to the Court's discussion of the pending motions. The Court therefore turns only to review the testimony of fact witnesses and other evidence before evaluating whether that evidence could support a reasonable jury finding of negligence.

A.   Plaintiff

Plaintiff stated that on the date of his injury he was on duty, heard a commotion coming from the area of the K-Mart, and went to assist other officers attempting to effectuate an arrest. When Plaintiff became involved, the suspect had already grabbed on to a metal barricade. Tr. 175. It was clear at trial that the suspect was holding on to a single metal barricade. Because Plaintiff became involved when the arrest was in progress, he could not testify where the barricade came from, or how it the suspect was in a position to grab on to it. While rendering assistance to the other officers, Plaintiff tried to use some sort of a judo move to throw the

5

suspect over his hip. Tr. 175. Plaintiff's hand became entangled with the suspect's body which led to Plaintiff's injury. Tr. 178-79.

Plaintiff stated that he knew that the GEM cart was over to the side of where the incident occurred. Tr. 244-47. His testimony placing the GEM cart in its alcove parking spot was inconsistent with his pre-trial affidavit testimony. There, Plaintiff stated that the GEM cart was not parked in the alcove during the altercation. Plaintiff's counsel attempted to cure this inconsistency by asking his client whether the facts he swore to in his pre-trial affidavit were drafted by counsel, and signed by Plaintiff at counsel's request. Plaintiff responded in the affirmative. Id.

When testifying as to his knowledge of how the GEM cart was stored, Plaintiff referred to poles connected by "velvet" ropes, as well as the use of "some gates around the GEM cart in an L-shape." Tr. 206-07. Plaintiff's reference to "gates" is consistent with witness descriptions of the type of metal barricade grabbed by the shoplifter. Neither Plaintiff nor any other witness said that the shoplifter was holding on to a metal pole. Instead, there was agreement that he was holding on to a single metal barricade. Plaintiff's reference to the use of two gates to form an L-shape is consistent with the defense witness descriptions of how the GEM cart was protected; but inconsistent with Plaintiff's testimony regarding poles and ropes. Plaintiff answered "yes" when asked whether the metal gate involved in the scuffle that led to his injury was "out in the middle of nowhere". In particular, he testified that "it wasn't by the cart when [he] saw it." Tr. 207-08.

Plaintiff was taken to the hospital immediately following the incident. Tr. 184-85. He returned to work on light duty in April of 2015 until his retirement from the MTA on March 1, 2016 - two weeks after his 65th birthday. Tr. 193-96; 215.

B.     Lennon

Lennon is a retired MTA police officer who was not on duty on the date of the incident.

Tr. 36. He offered general testimony regarding the use of the GEM cart, describing it as

resembling a golf cart that was used to navigate around Penn Station. Tr. 32; 56-58. Lennon

testified that the GEM cart was stored in a recessed area near the K-Mart entrance, across from

the police precinct. Tr. 56. He had never witnessed the barricades surrounding the GEM cart

being used as a weapon. Tr. 57; 68. The only barricades that Lennon was asked about were those

protecting the GEM cart. Thus, he offered no testimony regarding any other barricades in Penn

Station. Nor did Lennon testify about the use of any poles and ropes to protect the GEM cart.

Lennon was cross-examined regarding his receipt of an MTA internal email regarding the

incident outside of the K-Mart and requesting any video thereof. Tr. 39-41; 43-46. That

testimony is discussed below.

C.     Thomas

Thomas is an MTA police officer who was on duty at the time of the incident. He

accompanied Plaintiff to the hospital.  Tr. 89. Thomas did not recall exactly where the arrest

occurred, including whether it occurred in an area near the GEM cart. Tr. 79-80. Nor was

Thomas able to testify as to the location of any barricades that might have been in use at the time

to protect the GEM cart. Tr. 84-85. Thomas did, however, testify in general about the metal gates

used to protect the GEM cart. Referring to metal barricades - and not to stanchion poles

connected by ropes - he stated that they were difficult to connect to each other. Tr. 96. Like

Lennon, Thomas testified that he never witnessed anyone using the barricades as a weapon. Tr.

99. He similarly testified that he had never seen any video footage of the incident. Tr. 102.

Thomas offered no testimony as to any barricades, gates or stanchions other than the two used to

protect the GEM cart.

    D.    <u>Patacca</u>

Patacca was deposed in 2018, and the parties agreed to reading portions of his deposition into the trial record. Patacca was on duty on the date of the incident. Tr. 133. He stated that the suspect had already grabbed on to a metal barricade by the time he became involved. Tr. 134. Thus, like the other MTA witnesses, Patacca was unable to say where the barricade grabbed by the suspect came from, and how it came into the suspect's possession. He testified that the suspect was sliding the barricade along the floor, and never lifted it into the air. Tr. 135-36.

Patacca corroborated Plaintiff's version of the events, saying that he, Thomas and Plaintiff were grabbing the gate and moving it around in their efforts to pull it away from the suspect. Tr. 137; 142. Patacca referred to the GEM cart protection gates as "barricades," stating that there were two of them used to protect the GEM cart - one in front and one beside the cart. Tr. 139. Patacca agreed that these barricades were used so that members of the public would not sit in the GEM cart, or otherwise trespass in its parking area. Tr. 140. Patacca testified that the gates were not hooked together. Tr. 139. As to the area where the GEM cart is stored, Patacca testified, consistent with other MTA witnesses, that it was stored in a dead end L-shaped corner near the K-Mart. Tr. 145. He stated that storage there made sense because the cart fit in the area, and therefore did not present a hazard. Tr. 145. Like the other MTA witnesses, Patacca never testified about any barricades, stanchions or gates other than the barriers gates used to guard the GEM cart.

    E.    <u>Photos Used as Demonstrative Evidence</u>

Several photos were used as demonstrative exhibits and described by Plaintiff at trial. Relevant to the motions here are photographs of a GEM cart surrounded by ropes attached to

pole stanchions, as well as those the depicting the exterior of the K-Mart. Despite uniform defense witness agreement as to the use of two barricades to form an "L" around the GEM cart, there were no photos used at trial (either demonstrative or in evidence) showing the GEM cart being protected in that way. Instead, the only photos that the jury saw of the GEM cart were those showing the pole and rope type of protection. The Court turns to discuss the photos seen by the jury.

The document appearing as DE 84-13 is a photo of a GEM cart surrounded by pole-like stanchions connected by what counsel referred to as a "velvet" rope. It is the photo identified by Plaintiff, as discussed above. It shows a GEM cart parked, not in the alcove spot described by witnesses, but in an area parallel to the Penn Station store entrances that are across from the police precinct. Plaintiff testified that he took this photo after his injury because he thought that no one else would take pictures, so he thought he should. Tr. 206. Plaintiff identified the photo as a fair depiction of how the GEM cart looked and was stored at Penn Station. Tr. 205. However, he also testified that the GEM cart depicted in the photo did not depict the storage location of the vehicle on the date of his injury. Tr. 206.

The document appearing as DE 84-14 is a photo of the exterior of the K-Mart. In this photo the GEM cart is parked in an area consistent with witness testimony describing where it was usually parked, i.e., in a recessed alcove along the same wall as the K-Mart. Contrary to MTA witness testimony, this photo shows the GEM cart surrounded by the pole and rope stanchions depicted in DE 84-13.

The document appearing as DE 84-16 is a photo of the front of the K-Mart store. It shows a clearer and closer angle of what is also depicted in DE 84-15. DE 84-16 shows stacks of metal barricades consistent with the description of the type of barricade that the shoplifting suspect was

grabbing. In this photo, several metal barriers are stored on the wall in front of the K-Mart pharmacy, adjacent to the store's main Penn Station entrance, and closer to the alcove where the GEM cart was parked. Considering the photos together, one can see that these metal barricades were alongside the Penn Station entrance to K-Mart, while the pole-like stanchions protecting the GEM cart were surrounding that vehicle in the alcove.

There was initially agreement allowing the jury to consider photos of metal barriers used and stored at unrelated outdoor train stations and venues. Plaintiff testified that he took these photos after his injury to be able to show that metal barricades were chained together. Tr. 206-07. At trial it became clear that there was no evidence of any similarity between the use of such barricades at other train stations and venues, and their use at Penn Station. If anything, the evidence demonstrated only stark differences. For example, there was evidence that metal barricades were chained to each other at outdoor stations where there was a danger that they could be stolen or thrown on the tracks. The barricades at Penn Station are not even on the same level as the tracks. If someone were to have the idea of throwing metal barricades on the tracks at Penn Station they would first have to carry them down to the track level.

It became obvious to the Court that differences between these outdoor locations and Penn Station made such evidence irrelevant under Rule 401 of the Federal Rules of Evidence, and even if relevant, properly excluded under Rule 403, as so as to avoid misleading and confusing the jury. See Tr. 211. Also excluded by the Court from the jury's consideration was a photograph of rioters at the United States Capitol on January 6, 2021. The photo shows members of the mob using metal barriers to injure members of law enforcement. The Court reacted to immediately remove the January 6 photo from the jury's view, and specifically instructed the jury that they were not to consider that photo.

F.     Testimony Regarding Alleged Video and Denial of Spoliation Charge

Koehler first raised the possibility that the arrest at K-Mart was videotaped as he was being taken to an ambulance. Thus, as he was leaving Penn Station he said "get the video." Tr. 183. Koehler testified that he never saw any video of the incident, and had no knowledge of anyone making any effort to obtain one. Tr. 184.

As noted, Lennon was asked, on cross-examination whether there was video footage of the scene of the arrest at K-Mart. Much of Plaintiff's counsel's inquiry on this subject focused on an email sent to Lennon and others at the MTA on November 17, 2014, by Susan Deshensky, who was with the MTA Police Medical Control Unit (the "Deshensky Email"). DE 84-18. The Deshensky Email refers to Plaintiff's injury. There were four recipients of that email and a fifth person copied thereon. Lennon is the first-named recipient. See DE 84-18. The Deshensky Email sought hospital paperwork, and also asked the recipients to "please determine if there is video of this incident and include the video". Id. When questioned about this email Lennon denied that he was the person responsible for obtaining video. He also testified that he did not know of the existence of any video responsive to the request. Nor was Lennon aware of whether any of the other listed recipients made any efforts to search for the requested video footage, and/or to determine if any such video existed. Tr. 39-46. Neither Deshensky nor any of the email recipients, other than Lennon, were called to testify.

As to the presence of any cameras, the jury saw (as demonstrative evidence) an exhibit showing a view of the archway over Penn Station's Central Corridor. DE 84-19. Thomas was asked about this photo on cross-examination. He agreed that it might depict the lens of a camera that faced the K-Mart entrance. There was no testimony establishing the presence of an actual camera, or even if there was such a camera, that it was recording on the day of Plaintiff's injury.

Based upon the foregoing testimony and demonstrative evidence Plaintiff's counsel requested a spoliation charge. This request was discussed with counsel, outside of the presence of the jury, during the charge conference with the Court. See Tr. 356-63. While Plaintiff sought a missing evidence charge with respect to any video of the incident, Defendant denied that there was ever a video, much less conduct warranting the requested charge. While Plaintiff represented that he made a request for surveillance footage during discovery, Tr. 358 (referring to routine demands) and called for the production thereof during a deposition, Tr. 360-61 (referring to "calling for production" during a deposition), it is clear that no footage was produced, and no motion regarding production was made while discovery was open, Tr. 358; 361 (indicating that no follow-up formal document demand was made). Plaintiff's counsel took the position that he was not required to make a post-deposition demand for surveillance footage because that demand was in his initial requests to produce. Tr. 361.

Defense counsel took the position that Defendant (in accord with their practice) properly responded to all document demands, indicating that no responsive video footage existed. Tr. 359. She further stated that she recalled no on-the-record call for production made by Plaintiff's counsel during any deposition. While this discussion with the Court was taking place, Defense counsel searched the index of Thomas's deposition for any call for production. She represented that there was no such request made. Tr. 362-63. She further represented that the only reference therein to any video was the question: "have you ever seen video footage of the entrance to the K-Mart before?" The answer was "don't recall the video seen in Penn Station." Tr. 362. All agreed that there was no written post-deposition demand for the production of any document.

The Court denied the request to give a spoliation charge. The Court noted the extreme nature of the charge requested, and held that the instruction was not warranted. In particular, it

was noted that the only testimony referring to any video was that of the Plaintiff and others who pointed to a photo (described above and appearing as DE 84-19) that they agreed looked like a camera. The Court acknowledged that there was undoubtedly an internal MTA request (as reflected in the Deshensky Email) to search for video footage, but that request was not answered. Tr. 367-68. Still, in light of the fact that there was no evidence that any cameras were operational at the time of the incident, or, indeed any clarity that the demonstrative exhibit depicted cameras, the Court denied the request for a spoliation charge. Denial of the spoliation charge did not, however, prevent Plaintiff's counsel from asking the jury to consider testimony in evidence, including the Deshensky Email.

G.    Stipulation as to Plaintiff's Intent to Seek Non-Economic Damages
Only to Age 70 and Demonstrative Chart Regarding Those Claims

Plaintiff was 71 years old at the time of trial. He testified that he would have continued to work at least until 2023. After discussion among counsel, Plaintiff's counsel agreed that he would seek damages in the form of wages and overtime reflecting only what Plaintiff would have earned if he worked until he reached the age of 70. Counsel agreed that Plaintiff's counsel could show the jury a handwritten document reflecting certain compensation amounts. DE 84-20. That document details the wages and overtime that Plaintiff alleged he would have earned for the years 2014 through 2021. To be clear, the chart reflects the amount that Plaintiff was asking the jury to award in the event that liability was established. By agreeing to the use of the chart, the MTA was not admitting liability, it was just agreeing to allow Plaintiff's counsel to show the jury his version of the numbers supporting his damages request.

H.    Testimony Regarding Mandatory Retirement

In support of their motion for remittitur, Defendant argues that Koehler was subject to a mandatory retirement age of 65. Defendant relies on Plaintiff's intent, as reflected in his personal

diary, and on what they characterize as clear evidence of MTA policies regarding overtime and retirement. The only defense evidence presented at trial with respect to any such policies came in the form of Thomas's testimony. As to overtime, Thomas testified that in his role as an officer he knew there was no guarantee of overtime hours. Tr. 101. As to mandatory retirement, Thomas was asked whether the MTA police department had such an age, to which he responded in the affirmative. Tr. 101. He then testified that the age for retirement is 65. Tr. 102.

Defendant questioned Plaintiff about diary entries reflecting that he was keeping track of days worked. That diary supports Defendant's theory that Plaintiff intended to retire at age 65. Plaintiff did, in fact, retire within weeks of reaching that age. He argues, however, that he was forced into retirement, and, as discussed above, testified he would return to work tomorrow if allowed.

IV.     Rule 50 Trial Motions Seeking Judgment

Both parties sought judgment as a matter of law during trial. Thus, at the close of the Plaintiff's case, the MTA moved pursuant to Rule 50 of the Federal Rules of Civil Procedure, for dismissal on the ground that Plaintiff failed to put forward evidence upon which a jury could reasonably rely to find in Plaintiff's favor. See Tr. 269. In particular, defense counsel argued that the evidence showed that "the metal barricades were there to protect the GEM cart from the general public," the use of interlocking metal barriers would have impeded the police response to an emergency, and there was no evidence that the MTA was on notice of Plaintiff's particular injury prior to the incident at the K-Mart. Tr. 269-70. Plaintiff opposed the motion and it was thereafter denied. Tr. 271. Defendant renewed its motion at the close of the evidence. Tr. 331. It was also denied, as was Plaintiff's motion for judgment as a matter of law. Id.

14

V.      Plaintiff's Counsel's Summation

Part of the present motions relate to Plaintiff's counsel's summation. The Court describes that summation to the extent necessary to render a decision herein.

A.      Alleged Switching the Theory of the Case

To appreciate Defendant's argument that Plaintiff's counsel's summation switched the theory of his liability case, and determine whether this aspect of the summation requires granting any of Defendant's motions, the Court reviews and compares relevant parts of counsel's opening statement and his summation.

1.      Opening Statement

Plaintiff's counsel's opening remarks gave the jury a preview as to how he would present his client's case, stating that he put witnesses on the stand "in no particular order". Tr. 16. He similarly promised to put in his evidence "in no particular order." Id. When describing the scuffle outside of the K-Mart, counsel told the jury that the evidence would show that the suspected shoplifter "grabbed on to one of those metal stanchions, something that the police use to divide crowds, barricade, to divert or protect the corded off areas." Tr. 18. When describing the scuffle, counsel described the barrier as a gate. Counsel later stated that "this metal stanchion" that the suspect grabbed onto "was originally there in a location nearby for the purposes of protecting, a golf-cart like vehicle that the MTA Police had in Penn Station." Tr. 20. Consistent with testimony that would be developed, he stated that the cart was parked in an alcove, "where they put one gate horizontal, one gate vertical, and make like an L to cord off the golf cart in the hopes of discouraging the public from using it." Tr. 21. He also stated that when the cart was in use, the MTA "did nothing to secure the gate, the metal stanchion, and this is why we say they are negligent." Tr. 21. At the same time, counsel stated that "[t]he gate was left there in the

middle of nowhere where it could be grabbed, pushed aside. It wasn't hinged from the other gate." Tr. 21. He stated that "a reasonably prudent employer should have done, we submit to you, they should have secured it." Tr. 22.

> 2.      Closing Statement

In closing, Plaintiff's counsel took the position that while the K-Mart arrest had everything to do with pulling the suspect's hands off a metal barrier, that barrier "had nothing to do with the GEM cart." Tr. 384. Counsel stated "[w]hat I told you was the negligence here was what the railroad did with regard to a barricade that wasn't in use, and that's what we have here. Referring to the demonstrative exhibit showing several barricades stored outside of the K-Mart, counsel said, "[y]ou saw the pictures of how the barricades were nested when they were not in use and that's what we have here." Tr. 385.

Stressing again that the incident had nothing to do with GEM cart storage, counsel reiterated that the case "didn't have anything to do with the GEM cart. This had to do with the stanchion that was out in the middle of nowhere where it didn't belong because they didn't secure it. That's negligence. The jury was told that when they get the verdict sheet they should find Defendant negligent "not because of what occurred by the GEM cart. That had nothing to do with the case. It's the loose stanchion that was out in the middle by Kmart. They can't account for that. . . "That's the negligence, a reasonable employer would not leave a loose stanchion in the middle of nowhere where it can be subject to abuse, where somebody can misuse it, where it can be, for lack of a better word, weaponized in the right circumstance, and it was in this case." Tr. 389-90.

> B.      Alleged References to Excluded Material and Inflammatory Language

Despite the Court's ruling prohibiting the jury from considering evidence of barricades at

other places, Plaintiff's counsel's closing argument referenced the chaining of barricades at other stations. Tr. 385. As to missing video footage, counsel was certainly free to comment on the Deshensky Email, and state, for example, that it showed a request for video and no follow-up by the MTA. Counsel, however also made repeated references to an actual "missing video". Tr. 386. Thus, when discussing the failure of the MTA to follow up on the request in the Deshensky email, counsel stated, "when they don't produce it, it's their fault and you have to assume that the video would have shown what we say happened, and that's why they didn't prove it. That's why they didn't come forward with it and that's why it's so important. Because they were asked to do it, not my job. Then they do the bureaucratic two-step, the blue wall? Come on. You can't be so naïve as to accept that." Tr. 387.

C.     Alleged Inflammatory Remarks

In his summation, Plaintiff's counsel accused the MTA of not wanting to know the truth of what happened "because they knew they would get sued. Their trial preparation was, as characterized by counsel, to "muddy it up, if they can make a muck of the story, maybe they could con a jury into believing something that isn't true, in this case, negligence." Tr. 384. He further told the jury that at the MTA it was "hear no evil, see no evil, speak no evil . . . . It's the corporate two-step and, I'm sorry. That's wrong. That's negligence. That's covering up because they know they are going to get sued. They know he's [referring to Plaintiff] going to come before you and ask for money and here's the concern. She [referring to defense counsel] talks about credibility. The MTA wants to save the money. That's why they come here and they put up a sham case." Tr. 388.[2]

---

[2]     Plaintiff's counsel's closing statement also made extensive inflammatory remarks about Dr. Hobeika's testimony and the MTA's interactions with this expert. Because the MTA has not

Counsel referred to his client's testimony that Deshensky made him "put in his papers" as the "smoking gun with the blood right in front of your face" which he saved "for the last thing so that you really know the evil, the enemy, the depths which the MTA will go to try to mislead you." Tr. 393-94. Counsel stated that his client was wrongfully "forced to quit the railroad by Lieutenant Deshensky because the lawyers told her to do it. That's how you defend a case when you are the MTA. You make people do things they don't want to do, and you hide it, disgusting." Tr. 396.

D.     Remarks as to Damages

Defendant's main argument in support of remitting the non-economic damages award is directed to evidence of a mandatory retirement age and the demonstrative chart that Plaintiff's counsel showed the jury to support his request for economic damages. A further discussion of these matters is taken up below in connection with the Court's discussion of the motion for remittitur.

VI.    The Verdict

The jury found in favor of the Plaintiff in the total amount of $500,000. They awarded Plaintiff $375,000 for lost wages and overtime; $62,500 in past physical pain and suffering, and $62,500 for future pain and suffering. Plaintiff was injured in 2014, while still employed by the MTA. The wages and overtime award was expressed as "past" lost wages and overtime because at the time of trial Plaintiff was 71 years old - one year beyond the age for which wages were sought, and six years beyond the age at which Defendant argued he would have been required to

_____

asked the Court to remit the non-economic damages it is unnecessary to discuss that testimony or counsel's remarks with respect to Dr. Hobeika. Suffice it to say that the reference to a "sham" case was likely also intended to refer to the MTA's strategy with respect to presentation of this witness.

retire.

VII.    <u>The Present Motions</u>

Defendant moves pursuant to Rules 50, 59 and 60 of the Federal Rules of Civil Procedure to set aside the verdict and/or for a new trial. In the alternative, Defendant seeks remittitur as to the $375,000 award reflecting lost compensation. The Court turns to discuss the legal standards that apply, and disposition of the motions.

ANALYSIS

I.    <u>Rules 50, 59 and 60 Motions: Legal Standards</u>

Under Rule 50 of the Federal Rules of Civil Procedure a court may grant a party judgment as a matter of law if they have "been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1), (b). Rule 50 motions for judgment as a matter of law are governed by the same standards applied to motions for summary judgment. The Rule 50 standard is "appropriately strict." <u>Stubbs v. Dudley</u>, 849 F.2d 83, 85 (2d Cir. 1988). To grant such judgment, there must be either "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture," or "such an overwhelming amount of evidence in favor of the movant that reasonable and fair-minded persons could not arrive at a verdict against it." <u>Wiercinski v. Mangia 57, Inc.</u>, 787 F.3d 106, 112 (2d Cir. 2015) (quoting <u>Brady v. Wal–Mart Stores, Inc.</u>, 531 F.3d 127, 133 (2d Cir. 2008)); <u>Millea v. Metro-North R.R. Co.</u>, 658 F.3d 154, 161 (2d Cir. 2011); <u>Newmont Mines Ltd. v. Hanover Ins. Co.</u>, 784 F.2d 127, 132 (2d Cir. 1986).

Under Rule 59, courts may grant a new trial after a jury trial has been held "for any reason for which a new trial has heretofore been granted in an action at law in federal court."

19

Fed. R. Civ. P. 59(a)(1)(A). Such a motion, made pursuant to Rule 59(e), is properly granted where there is a "need to correct a clear error or prevent manifest injustice." Hollander v. Members of Bd. of Regents of Univ. of N.Y., 524 F. App'x. 727, 729 (2d Cir. 2013). The standard governing a motion for a new trial is "less stringent" than the standard governing a motion for judgment as a matter of law, in that (1) the court may order a new trial even if there is substantial evidence supporting the jury's verdict, and (2) the Court may weigh the evidence and need not view it in the light most favorable to the party that prevailed at trial. Manley v. AmBase Corp., 337 F.3d 237, 244–45 (2d Cir. 2003); DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 133–34 (2d Cir. 1998); In re Vivendi Universal, S.A. Securities Litig., 765 F. Supp. 2d 512, 573 (S.D.N.Y. 2011). A court should grant a new trial if it finds that the verdict is "against the weight of the evidence," or "if the trial was not fair to the moving party," United States v. Greer, 285 F.3d 158, 170 (2d Cir. 2002); see Rosado v. Soriano, 2021 WL 5910384, * 1 (S.D.N.Y. Dec. 13, 2021) (new trial warranted only if the jury verdict was "seriously erroneous" or "a miscarriage of justice") (quoting, Farrior v. Waterford Bd. Of Educ., 277 F.3d 633, 634 (2d Cir. 2002). A trial may be unfair to the moving party if substantial errors were made in admitting or excluding evidence, or in charging the jury, or if misconduct by counsel during the course of the trial causes unfair prejudice to the moving party. See Pappas v. Middle Earth Condo. Ass'n, 963 F.2d 534, 540 (2d Cir.1992); Sharkey v. Lasmo (AUL Ltd.), 55 F. Supp. 2d 279, 289 (S.D.N.Y. 1999).

While the decision is discretionary, a Court may only grant a motion for a new trial "if the jury has reached a seriously erroneous result or [its] verdict is a miscarriage of justice," or "if substantial errors were made in admitting or excluding evidence." Stampf v. Long Island R.R. Co., 761 F.3d 192, 202 (2d Cir. 2014) (internal citations and quotation marks omitted). When

considering whether to exercise its discretion to order a new trial "a judge should rarely disturb a jury's evaluation of a witness's credibility and may not freely substitute his or her assessment of the credibility of witnesses for that of the jury simply because the judge disagrees with the jury." Raedle v. CreditAgrcole Indosuez, 670 F.3d 411, 418-19 (2d Cir. 2012) (citation and internal quotation marks omitted); LeClair v. Raymond, 2022 WL 1046441, *1 (N.D.N.Y. April 7, 2022). Indeed, when invited to overturn a jury verdict based upon the credibility of any witness, a court must act with "caution and great restraint." Crockett v. City of New York, 2017 WL 1437333, at * 12 (E.D.N.Y. Apr. 21, 2017).

Rule 60 of the Federal Rules of Civil procedure "prescribes procedures by which a party may seek relief from a final judgment." Azeez v. City of New York, No. 16-cv-342, 2021 WL 3578500, at *6 (E.D.N.Y. Aug. 13, 2021) (quoting House v. Sec'y of Health & Hum. Servs., 688 F.2d 7, 9 (2d Cir. 1982)). It provides six independent grounds upon which federal courts may grant such relief. The last of these enumerated grounds, appearing as subsection (6) of Rule 60, is the only provision of Rule 60 that might apply here. It is a catch-all provision that allows for the motion to be granted for "other reason that justifies relief." Fed. R. Civ. P. 60(b). Rule 60 is recognized to allow for "extraordinary judicial relief" that is "invoked only upon a showing of exceptional circumstances." CDS Bus. Servs., Inc. v. H.M.C., Inc., 2022 WL 17832849, at *2 (E.D.N.Y. Dec. 21, 2022) (quoting, Nemaizer v. Baker, 793 F.2d 58, 61 (2d Cir. 1986). Similar to Rule 59, a Rule 60(b)(6) motion is properly granted only where a verdict would result in an "extreme and undue hardship." Shor Int'l Corp. v. Eisinger Enters., Inc., No. 90 Civ. 2353, 1993 WL 452546, at *1 (S.D.N.Y. Nov. 3, 1993). Like Rule 59, a motion under Rule 60(b) "is addressed to the sound discretion" of the court. Emergency Beacon Corp. v. Barr, 666 F.2d 754, 760 (2d Cir. 1981).

II.  Disposition of the Rule 50, 59 and 60 Motions

    A.  Sufficiency of Evidence of Negligence

Defendant argues that the evidence at trial could not sustain a reasonable jury verdict on the issue of negligence. They therefore seek to overturn the verdict pursuant to Rule 50. They seek the same relief and/or a new trial under the less stringent standards of Rules 59 and 60. In support of their motions, The MTA argues that the jury's finding of liability was necessarily based upon the suspect's use of a barrier "in the middle of nowhere", which theory had no supporting evidence. Defendant additionally argues that Plaintiff's counsel unfairly switched the theory of the case away from GEM cart storage to this unsupported version of events that the jury accepted. Finally, the MTA argues that because it had no prior knowledge of any barrier ever being used as a weapon, the jury could not have reasonably found foreseeability. No argument advanced requires setting aside the verdict or a new trial.

    1.  Sufficiency of Evidence to Support A Theory Not Involving the GEM Cart

The Court agrees with the MTA that most of the trial testimony about metal barriers focused on their use to protect the GEM cart. Testimony also indicated that the cart was usually stored in an alcove near the pharmacy entrance to that store. See Tr. 136; 145; 205. It also seemed that there were never more than two metal barriers that were used to protect the GEM cart. Tr. 37; 136. The evidence could also support finding that two barricade-like barriers were routinely used to guard the cart, and that such barriers were not always connected to each other. Tr. 37; 54; 94; 139-40. At the same time, there was evidence that the GEM cart was routinely guarded not by metal barricades (whether or not attached to each other) but by free standing poles attached by roping. This was true of a photograph taken by Plaintiff after the incident, as well as a demonstrative exhibit used at trial showing the GEM cart in the alcove, where everyone

agreed it was usually parked, surrounded by poles connected by ropes. See Tr. 35; 62 (referring to "pipe" stanchions) DE 83-13;14.

While it was clear that the GEM cart was usually stored in the alcove, the evidence at trial left no doubt that the scuffle involving the shoplifter did not take place in that alcove, but in front of the K-Mart. Tr. 207-08. All witnesses agreed to that location. Witnesses also agreed that the suspect was grabbing on to a metal barricade, similar to those described by the MTA as guarding the GEM cart, as well as those stored in front of the K-Mart. The jury could have reasonably found that if a metal barricade used in the scuffle was previously used to guard the GEM cart, that barricade was, as argued by Plaintiff, left out "in the middle of nowhere" where it could be subject to misuse. The jury could also have reasonably considered the barriers in front of the K-Mart as within the control of the MTA, and that one of those barriers was left unattended and was thereafter involved in the incident leading to Plaintiff's injury. The MTA offered no evidence to disabuse them of this possible and reasonable version of the facts.

This is not to say that Plaintiff's counsel made it easy for the jury to understand his theory of the case. There is no doubt that the presentation of the evidence by Plaintiff's counsel made it hard for everyone (including, as demonstrated by their note, the jury) to comprehend and visualize the facts surrounding the incident in front of the K-Mart. Indeed, Plaintiff's counsel made clear his intent to present his case in a confusing manner in his opening statement when he stated that he "put witnesses on the witness stand in no particular order" and "put evidence in in no particular order." Tr. 16. This presentation may have left the MTA somewhat flat-footed, but that is an insufficient ground for overturning the jury verdict.

Defense counsel must also share some of the blame for what they characterize as the confusing nature of the testimony. At its most basic level the testimony was unclear because

counsel and witnesses variously referred to "the" barriers, stanchions, and/or gates (in the plural) as well as "a" barrier, stanchion and/or gate (in the singular). E.g., Tr. 82 (referring to pipe stanchions) Tr. 83 (referring to metal barricades); Tr. 84 (referring to one stanchion); Tr. 86 (referring to gates placed at a right angle); Tr. 94 (referring to "L shaped" gates); Tr. 97 (referring to gates pushed against the wall). Plaintiff's counsel may have exploited this loose use of terms, but counsel for the MTA did nothing to sharpen the picture in the eyes of the jury.

Years of discovery and pretrial preparation certainly afforded the MTA the opportunity to investigate exactly how the GEM cart was protected from misuse by the public and provide clear testimony about barriers. They could have attempted to agree on a uniform use of terms, and the propriety of photographs used at trial. They did none of these things. Instead, defense counsel allowed the use of photographs directly contradicting their theory that only two metal gates protecting the GEM cart were ever in use near the area of the incident. They did nothing to contradict photos showing the cart protected by poles and ropes. Nor did they clarify demonstrative photos shown to the jury of metal barricades in front of the K-Mart, directly across from the police precinct. Even though the Court instructed the jury not to consider previously introduced photographs of other train stations and venues, they were nonetheless free to consider a photograph of the GEM cart being protected by poles connected by ropes (and not, consistent with the MTA's theory of the case by two metal barricades) as well as the photo of metal barricades stacked and nested in front of the K-Mart. DE 84-13. The MTA never made any case explaining whether those barriers even belonged to the MTA, much less why they were stored in front of K-Mart in full view of the police precinct.

In the context of the pending motions, the MTA's arguments fail to consider the entirety of the evidence before the jury. Defendant's somewhat myopic view of the trial cannot be relied

upon to reject the jury verdict. The MTA chose to present their case in a certain way, focusing

only on the GEM cart storage in the alcove. Even that theory was marred by evidence showing

that vehicle protected by pole stanchions and ropes, and not by perpendicularly placed metal

barriers. In summation, defense counsel focused only on metal barriers surrounding the GEM

cart in an L-shape. They framed for the jury a theory of negligence based only on these two

barriers. See Tr. 372 (Plaintiff "must prove to you that the MTA knew or should have known that

those barriers around the GEM cart were dangerous"); Tr. 372 (barriers were used only to keep

people from sitting on the GEM cart); Tr. 374-75 (theorizing that the "gates were not connected"

but that it would have been dangerous to have them connected at all times); Tr. 377 (stating "we

know that the GEM cart was there. . . we know that the gates were in an L-shape").

Defendant's presentation left a sufficient void in the facts that allowed the Plaintiff to

present the jury with a different version of what happened. Plaintiff's counsel capitalized on the

MTA's singular focus on the barriers around the GEM cart, explaining that the barriers in that

area should not be the focus of the jury's consideration, but that they should focus on the barriers

outside of the K-Mart entrance, proposing the reasonable theory that one of those was left loose

and unattended. He proposed this theory in his opening and closing statements. The MTA could

have presented a witness to explain the presence of these barriers, but it did not. Instead, it left

the evidence in front of the jury to consider, which it did. Defendant's presentation of the case

left the door open for the jury to draw the reasonable conclusions that they did. These

conclusions are, that the metal barricade grabbed by the shoplifter: (1) was near the K-Mart

directly across from the police precinct; (2) was, like the metal barricades the MTA used to

protect the GEM cart, in the control of the MTA, (3) was left unattended by the MTA "in the

middle of nowhere" and (4) was grabbed by a shoplifter attempting to flee the store. In the end, it

was the MTA that chose to focus its entire case on the GEM cart alcove storage area, and to ignore the uncontradicted evidence that the altercation did not take place there. It is also responsible for allowing the jury to view, but fail to present a witness to explain, the placing of the same type of barricades as those used to protect the GEM cart in front of the K-Mart and across from the police precinct. Plaintiff's counsel was free to exploit these gaps in the MTA's trial strategy. In sum, because the jury reached a reasonable conclusion supported by evidence the Court denies the motion to set aside their verdict under Rule 50.

Nor does the jury's acceptance of Plaintiff's version of the facts warrant a new trial under Rules 59 and/or 60 -- even when weighing the evidence and reviewing the record for the miscarriage of justice necessary to order a new trial. The Court's close review of Plaintiff's counsel's opening and closing statements leads it to reject the notion that he completely switched his theory of the case and that a new trial is therefore required. When describing the scuffle outside of the K-Mart during his opening statement, counsel told the jury that the evidence would show that the suspected shoplifter "grabbed on to" a barricade similar to those used by police to protect cordoned off areas. Tr. 18. While the opening statement made references to the GEM cart storage (raising in the minds of a reasonable juror that the barricade at issue was used to protect that vehicle) it also made clear Plaintiff's position that the metal barricade was placed "in the middle of nowhere." Tr. 22. This description certainly left open the possibility that the evidence would show that some sort of a barricade was used by the suspect, that the barricade might have been the one used to store the GEM cart, or another MTA barricade, and that the barricade involved was negligently left unattended. Consistent with this theory counsel's closing statement argued that the facts supported a finding that the barrier was "in the middle of nowhere." Tr. 387-89-90.

Based on counsel's argument and the evidence presented at trial, no one should have been surprised when the jury asked whether the "fence/barricade" that the shoplifter grabbed "was an additional one or one that was typically used to section off the GEM cart?" Court Exh. 1. The jury also reasonably asked whether that "fence/barricade" "was an additional one in addition to what fences off the GEM cart, did the MTA or any other establishment within Penn Station utilize them in that area for other functions?" Court Exh. 1. The Court did not read back any testimony and simply instructed the jury to consider the evidence at trial. They continued their deliberations and found in favor of Plaintiff.

   2.    There was Sufficient Evidence of Foreseeability

The MTA argues that the lack of evidence of prior use of barricades as weapons is fatal to the element of foreseeability, which requires setting aside the verdict and/or a new trial. The Court disagrees.

The FELA elements of duty and foreseeability are discussed above. All agree that the MTA has a duty to provide its employees with a safe workplace, Tufariello, 458 F.3d at 91. The MTA breaches that duty if it fails to protect employees of workplace hazards of which it knew or should have known. Id. "Reasonable care is determined in light of whether or not a particular danger was foreseeable." Syverson v. Consol. Rail Corp., 19 F.3d 824, 826 (2d Cir. 1994). Foreseeability of harm, which is an essential FELA element, CSX Transp., Inc. v. McBride, 564 U.S. 685, 703, 131 S. Ct. 2630, 180 L. Ed. 2d 637 (2011), "requires proof of actual or constructive notice to the employer of the defective condition that caused the injury." Sinclair, 985 F.2d at 77 (emphasis added). FELA's relaxed standard does not change this element, it dictates only that liability may be imposed where the proven negligence of an entity like the MTA "played any part, even the slightest, in producing the injury or death for which damages

27

are sought." <u>Rogers v. Missouri Pac. R. Co.</u>, 352 U.S. 500, 506, 77 S. Ct. 443, 77 S. Ct. 443 (1957); <u>see also</u> <u>CSX Transp.</u>, 564 U.S. at 703-04, 131 S. Ct. 2630.

Like its argument with respect to the overall sufficiency of the evidence, the MTA focuses on the singular theory that the barricades surrounding the GEM cart were the barriers involved in the scuffle outside of K-Mart. Thus, they argue that "the location of the GEM cart and the barrier did not create an unreasonable risk of harm, and even if they did, the MTA had no actual or constructive notice that the location of the barrier created a potential hazard." Defendant Mem. at 18. They also argue here, as they did at trial, that there was no evience of prior use of barriers as weapons.

The negligence alleged by Plaintiff was allowing a metal barrier to be untethered in an area where it could be subject to misuse by a member of the public. The negligence alleged is the failure to keep all such barriers (including barricades, poles and ropes) properly secured to avoid injury that could follow from any misuse. Thus, it need not have been proven that the MTA had knowledge that the barriers surrounding the GEM cart were misused in a particular way, just that it had a duty to secure all barriers so that they could not be subject to misuse.

In addition to choosing to defend this case by narrowly focusing only on the GEM cart barriers, the MTA's repeated use of the term "weapon" is somewhat misleading in the way that it frames the foreseeability issue. The facts here show that the suspect was resisting arrest by holding on to a metal barricade, which the jury could reasonably find was left unattended by the MTA. It was in trying to extricate the suspect from the barricade that Plaintiff was injured. Such misuse of an unattended barricade is the matter that required a finding of foreseeability - not the particular way in which it was used to result in injury. For that reason, Plaintiff was not required to show, as argued by the MTA, that the use of a GEM cart barricade as a weapon was

foreseeable; he needed only show that misuse of an unattended barricade was foreseeable. The jury was allowed to make this reasonable finding. They did, and thereafter resonably found that the MTA was negligent.

      B.      <u>Plaintiff's Counsel's Confusing and Inflammatory Closing Statement</u>

Defendant's motions complain about Plaintiff's closing statement for two reasons. First, it is argued that counsel switched the theory of his case to reflect a theory of the facts not supported by the evidence. The Court has already handled this issue in connection with its discussion of the sufficiency of the evidence. To reiterate, there was sufficient evidence - although confusingly presented - to support the jury's finding of negligence.

As to inflammatory remarks made during closing argument, the Court agrees that the summation was close to the line of permissible comment. However, defense counsel failed to object during that statement. While it may be unprofessional to continually object during an opponent's closing statement, there are undoubtedly circumstances where objection is required. Here, defense counsel made a tactical decision to wait until after the jury verdict to object to counsel's remarks. Counsel no doubt thought that the jury would not be swayed by Plaintiff counsel's manner. The Court cannot say whether they were. What the Court can say is that such remarks do not require a new trial.

It is well established that "[n]ot every improper or poorly supported remark made in summation irreparably taints the proceedings; only if counsel's conduct created undue prejudice or passion which played upon the sympathy of the jury, should a new trial be granted." <u>Marcic v. Reinauer Transp. Cos.</u>, 397 F.3d 120, 127 (2d Cir. 2005); <u>see also</u> <u>Parrish v. Sollecito</u>, 280 F. Supp. 2d 145, 168 (S.D.N.Y. 2003) ("A new trial is only warranted where the attorney's concluding argument deprived the opposite party of a fair trial.") (internal quotation marks

omitted). Whether to order a new trial due to remarks made during summation "is within the broad discretion of the trial court." Parrish, 280 F. Supp. 2d at 168.

The Court has considered the "totality of the circumstances" surrounding the challenged statements from plaintiffs' summation, see Marcoux v. Farm Serv. & Supplies, Inc., 290 F. Supp. 2d 457, 472 (S.D.N.Y. 2003), and finds that the challenged statements do not warrant a new trial.

III.   Evidence Regarding Other Train Stations

Defendant agrees with the Court's decision to exclude evidence regarding the use and storage of metal barriers at other stations and venues. While this evidentiary ruling is therefore not a part of the MTA's motions, Plaintiff's opposition disagrees with the Court's rulings. The Court discusses its decision with respect to the excluded evidence herein for clarity.

Plaintiff attempted to introduce into evidence photos of storage and protection of metal barriers at other train stations and venues. Instead of objecting to the introduction of such evidence before trial, Defendant allowed Plaintiff to have his client testify about that evidence at trial. It was only when the Plaintiff showed the jury a picture of the January 6, 2021 insurrection rioters using barricades to injure law enforcement officers at the United States Capitol that defense counsel began to object. Tr. 62. It was at that point that the Court stepped in to put a halt to this irrelevant and highly prejudicial evidence. The Court instructed counsel to take the January 6 photograph down from the projector and further instructed the jury that practices at other stations and venues were not to be considered in this case. Apart from the obvious prejudicial nature of the January 6 photograph, the Court held that photos of other stations and venues had no bearing on the facts in this case. Tr. 211. To the extent that Plaintiff argues that this evidence should have been allowed to be seen by the jury, the Court disagrees - again. To the extent that Defendant has any problem with the way in which the Court handled this issue the

Court reminds counsel that they could have sought exclusion of such evidence pre-trial or sought a mistrial. Neither option was exercised.

In light of the foregoing standards and upon consideration of the entire trial evidence, the Court holds that there are no grounds requiring a new trial. The jury verdict did not result in a miscarriage of justice and/or extreme or undue hardship. Instead, the jury did not agree with the MTA's version of events but chose, instead, to accept the version proposed by the Plaintiff. Nor is a new trial warranted by the incorrect admission of any evidence. Indeed, the court's evidentiary rulings with respect to admission of evidence and spoliation, the only evidentiary rulings discussed in the motion, were made in favor of the MTA. It therefore cannot be heard to argue that any substantial errors were made with respect to the admission of any evidence - it objected to none.

IV.    Motion for Remittitur

Having determined that a reasonable jury could have found in favor of Plaintiff and that a new trial should not be ordered the Court turns to the alternative motion for remittitur of the economic damages awarded.

A.    Remittitur: Legal Standards

Remittitur of damages is appropriate if an award "deviates materially from what would be reasonable compensation." When considering this motion the court must "determine whether the jury's verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered." Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 435, 116 S. Ct. 2211, 135 L. Ed. 2d 659 (1996) (quoting Browning–Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 279, 109 S. Ct. 2909, 106 L. Ed. 2d 219 (1989)). Under New York law, an award is "excessive or

inadequate if it deviates materially from what would be reasonable compensation." N.Y. C.P.L.R. § 5501(c); Stampf v. Long Island R.R. Co., 761 F.3d 192, 204 (2d Cir. 2014) (quoting N.Y. C.P.L.R. § 5501(c)); Okraynets v. Metro. Transp. Auth., 555 F. Supp. 2d 420, 439 (S.D.N.Y. 2008). As to application of the Federal Rule 59 standard, the decision whether remittitur is required is discretionary. Cross v. N.Y.C. Transit Auth., 417 F.3d 241, 258 (2d Cir. 2005) (appellate review of remittitur decision subject to abuse of discretion standard).

"Remittitur is appropriate to reduce verdicts only in cases 'in which a properly instructed jury hearing properly admitted evidence nevertheless makes an excessive award.'" Tatum v. Jackson, 668 F. Supp. 2d 584, 602 (S.D.N.Y. 2009) (quoting, Werbungs Und Commerz Union Austalt v. Collectors' Guild, Ltd., 930 F.2d 1021, 1027 (2d Cir.1991) (internal citation omitted). "A remittitur, in effect, is a statement by the court that it is shocked by the jury's award of damages." Ismail v. Cohen, 899 F.2d 183, 186 (2d Cir. 1990).

B.    Disposition of the Motion for Remittitur

Defendant argues that the jury award of $375,000 in economic damages is unsupported by the evidence. This award is significantly less than the over $1 million that Plaintiff's counsel asked the jury to award, but more than the $100,000 that the MTA concedes might be sustained by the evidence at trial. Def. Mem. at 24 n.6. While documentary evidence of Plaintiff's compensation was before the jury, the MTA did nothing to bring that evidence to the jury's attention to give them a precise number that might be awarded. Indeed, counsel did not bring up a possible maximum award of $100,000 during closing argument. Instead, that amount makes its first appearance in a footnote in the MTA's moving memorandum of law. See id. Principally, however, Defendant argues that the jury could not have reasonably awarded damages

representing any amount that might have been earned by Plaintiff beyond his mandatory retirement age of 65, which it now states is at the most, approximately $100,000.

The evidence before the jury as to economic damages consisted of Plaintiff's testimony indicating that he would have continued to work until the day he died, that he would return to work tomorrow if the MTA would allow it, and that he was aware of co-workers who continued to work past the age of seventy. Plaintiff also testified as to overtime compensation, indicating that his seniority entitled him to as many hours as he wanted, and that in the past he had generally doubled his salary as a result of overtime hours.

In support of their position that there was clear and uncontradicted testimony regarding the MTA mandatory retirement age of 65, Defendant points to the testimony of Lennon. They also argue that overtime hours were not allocated as represented by Plaintiff. While defense counsel could certainly have presented a witness to testify as to the retirement system and allocation of overtime hours, they did not do so. Nor did they present documentary evidence to the jury supporting their mandatory retirement age argument. Thus, there was no witness to testify as to the relevant terms of a collective bargaining agreement and no document evidencing such an agreement put into evidence. Instead, Defendant invites the Court to discredit Plaintiff's testimony regarding the retirement age and overtime hour allocation on the ground, inter alia, that he had "no personal knowledge of the [MTA] retirement plan and [Plaintiff] is not a corporate witness." Def. Mem. at 23. While Defendant could have presented such a witness, they failed to do so. The jury was therefore left only with the largely un-rebutted testimony of Plaintiff. They could have accepted the general testimony of Lennon as to the retirement age, but in the absence of a clear document, they certainly were not required to do so.

As to amounts that Plaintiff could have earned, again the MTA failed to prevent evidence supporting their position. Plaintiff filled the evidentiary void with the use of argument and a demonstrative exhibit which the parties agreed could be used at closing argument. That document supported Plaintiff's counsel's argument that he sought only economic damages until Plaintiff reached the age of 70. By way of this demonstrative exhibit and argument, counsel represented that if Plaintiff was not injured in 2014 he would have earned an additional $14,000 in overtime that year, and between $80,000 and $85,000 in overtime wages in 2015. Plaintiff's demonstrative exhibit also detailed compensation that he would have earned for the years, 2016 through 2021, when Plaintiff reached age 70. These calculations accounted for a yearly 3% pay increase. In particular, Plaintiff sought $160,000 for the year 2016 (accounting for a pay raise and his February 2016 retirement). Additionally, Plaintiff sought an award of $150,000 for each year from 2017 through 2021. The lower annual compensation for 2017 through 2021 was explained by Plaintiff's counsel to represent the fact that by 2016 Plaintiff would have had sufficient "good years" credited toward his pension so that he did not have to work as many overtime hours, and could have "glided in to his retirement." Tr. 396. The total amount of economic damages sought by Plaintiff therefore totaled in excess of $1 million. In light of the evidence at trial the jury was well within its reason to award Plaintiff a fraction of the damages sought, i.e., $375,000. The motion for remittitur is denied.

<u>CONCLUSION</u>

For the foregoing reasons, Defendant's post-trial motions pursuant to Rules 50, 59 and 60

of the Federal Rules of Civil Procedure are all denied.

**SO ORDERED.**

/s/ Anne Y. Shields

Anne Y. Shields
United States Magistrate Judge

Dated: Central Islip, New York
       March 14, 2023